IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| CROSSMANN COMMUNITIES OF NORTH CAROLINA, INC.; CROSSMANN COMMUNITIES, INC.; BEAZER HOMES INVESTMENT CORPORATION; BEAZER HOMES CORP., INC., | ) ) ) ) ) ) ) | Case No. 4:09-CV-1379-RBH |
| Plaintiffs, | ) ) | **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER** |
| v. | ) ) | |
| HARLEYSVILLE MUTUAL INSURANCE COMPANY, | ) ) ) | |
| Defendant. | ) | |

This matter is before the Court following a bench trial held on August 12 and 13, 2013. Having considered the testimony of the witnesses, both in court and by way of deposition, the exhibits, and arguments of counsel, the Court issues the following Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure. To the extent that any findings of fact constitute conclusions of law, or vice-versa, they shall be so regarded.

**Introduction and Procedural History**

This insurance coverage action was filed on May 26, 2009 by Cincinnati Insurance Company ("Cincinnati") against Crossmann Communities of North Carolina, Inc. ("CCNC"), Crossmann Communities, Inc. ("CCI"), and Beazer Homes Investment Corp. ("BHIC").[1]

---

[1]       Beazer Homes Corp. was added as a party to the action by consent of the parties on September 20, 2012.  [ECF No. 234.]  Crossmann Communities of North Carolina, Inc., Crossmann Communities, Inc., Beazer Homes Investment Corporation, and Beazer Homes Corp. are collectively referred to herein as "**Beazer**."

[Cincinnati's Complaint, ECF No. 1.] [2]  Cincinnati sold "umbrella" insurance policies to CCI as the first named insured.  The "umbrella" Cincinnati Policies were triggered upon exhaustion of underlying primary insurance and were in effect from July 1, 1998 until July 1, 2002.  [The Cincinnati Policies, ECF No. 1-2, 1-3.]  In this coverage lawsuit, Cincinnati sought a declaration that, among other things, it owed no coverage or defense obligations to Beazer under its insurance policies for losses arising from the construction-related property damage case filed in the South Carolina Court of Common Pleas in Georgetown County captioned "*True Blue Golf & Racquet Resort Homeowners Association, Inc. and True Blue Golf & Racquet Resort Horizontal Property Regime, plaintiffs versus Beazer Homes Corp., Inc. and Structure Home Builders, LLC, defendants*," Civil Action No. 2009-CP-22-00912 [hereinafter referred to as the "Underlying Lawsuit"]**.** [PX-208; ECF No. 186-7.]

On July 16, 2009, Beazer filed an Answer and Counterclaim in which it sought a declaration from this Court that the policies of insurance issued by Cincinnati provided both indemnification and a defense for the claims asserted and damages sought in the Underlying Lawsuit.  Beazer also asserted a claim against Cincinnati for breach of contract.

Subsequently, on August 31, 2009, Beazer moved to amend its Answer to assert a third-party Complaint against Harleysville Mutual Insurance Company ["Harleysville"].  This motion was granted on October 22, 2009, and on that same date, Beazer filed a Third-Party Complaint against Harleysville.  In that Third-Party Complaint, Beazer sought a declaration from this Court that Harleysville provided coverage and a duty to defend to Beazer Homes Corp. for the Underlying Lawsuit under policies of insurance that Harleysville had issued to a predecessor-in-interest to Beazer Homes, specifically Pinehurst Builders, Inc., and later Crossmann

---

[2]      Cincinnati also named as a defendant in its original complaint in this action the True Blue Golf & Racquet Resort Homeowners' Association (the "True Blue HOA").  True Blue HOA was dismissed from this action with the consent of the parties on July 10, 2013.

Communities of North Carolina, Inc. d/b/a Pinehurst Builders.  Harleysville filed an Answer and Counterclaim against Beazer and also a Crossclaim against Cincinnati on November 25, 2009, in which it sought a declaration that the Harleysville Policies did not provide coverage or a duty to defend to Beazer Homes Corp. for the Underlying Lawsuit.  On December 11, 2009, Harleysville filed a Fourth-Party Complaint against Indiana Insurance Company, Massachusetts Bay Insurance Company, Regent Insurance Company, Illinois Union Insurance Company, Liberty Mutual Insurance Company, and Zurich American Insurance Company alleging that if Harleysville was adjudicated to have coverage for Beazer Homes Corp. in the Underlying Lawsuit, one or more of these insurance companies, who issued policies of insurance to Crossmann Communities, Inc. or Beazer Homes Corp., had a duty to defend and should be held liable in contribution for any amounts to be paid by Harleysville.

On March 27, 2013, this Court issued Orders on the parties' respective motions for summary judgment.  In those Orders, this Court found that Beazer Homes Corp. was entitled to coverage under the policies issued by Harleysville to Pinehurst Builders, Inc. and Crossmann Communities of North Carolina, Inc. d/b/a Pinehurst Builders, because coverage passed to successors-in-interest through merger.  The Court further found that the allegations of the Underlying Lawsuit and the evidence from the affidavit in support of the motion for partial summary judgment showed at least the potential for property damage caused by an occurrence during the Harleysville policy period. Accordingly, this Court found that Harleysville had a duty to defend Beazer Homes Corp. in the Underlying Lawsuit.  This Court separately found that Harleysville was not entitled to contribution from the Fourth-Party Defendants.

The Court subsequently set for trial the remaining issues in this case, specifically whether there was coverage for any portion of the amount eventually paid by Beazer to settle the

Underlying Lawsuit, and if so, what amount, if any, Harleysville owed to Beazer for its pro-rata time-on-risk portion of those covered damages. In addition, the Court set for trial the issue of what amount, if any, Harleysville owed to Beazer in reimbursement of the reasonable, necessary and related defense costs in the Underlying Lawsuit. The parties agreed to submit the remaining issues for a bench trial. On the morning of the first day of trial, August 12, 2013, Cincinnati was dismissed from this lawsuit by stipulation of the parties.

### **FINDINGS OF FACT**

A.   Policies of Insurance Issued by Harleysville Mutual Insurance Company

1. Harleysville Mutual Insurance Company ("Harleysville") issued a Contractors' Business Owners Policy to "Pinehurst Builders, Inc.," Policy No. CB 9A 5801, for the policy period of July 29, 1997 through July 29, 1998. The policy included coverage for commercial property as well as general liability. Effective June 26, 1998, the named insured on the policy was changed to "Crossmann Communities of North Carolina, Inc. dba Pinehurst Builders."

2. The Contractors' Business Owners Policy issued by Harleysville was subsequently renewed for the policy period beginning on July 29, 1998. This policy was cancelled by the insured on August 29, 1998. (These two policies will hereinafter be referred to as "Harleysville Policies.")

3.   Defendant Harleysville's Exhibits 1 and 2 are true and accurate copies of the Harleysville Policies at issue in the present case.

4.   The insuring agreements contained in the Harleysville Policies state:

> 1. **Business Liability**. We will pay those sums that the Insured becomes legally obligated to pay as damages because of "bodily injury," "property damage," … to which this insurance applies. …
>
> a.      This insurance applies only:

      (1)      To "bodily injury" or "property damage:"

            (a)     that occurs during the policy period; and

            (b)     that is caused by an "occurrence." The "occurrence" must take place in the coverage territory. . .

    b.     We will have the right and duty to defend any "suit" seeking those damages.

The policy defines "suit" as a "civil proceeding in which damages because of . . . "property damage" . . . to which this insurance applies are alleged".

    5.     The Harleysville Policies contain the following exclusion:

    B. EXCLUSIONS

    1.     Applicable to Business Liability Coverage. This insurance does not apply to:

    n.     "Property damage" to "impaired property" … arising out of:

      (1)     A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work," or

      (2)     A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

    6.  The Policies define "impaired property" as:

    5.    "Impaired property" means tangible property, other than "your product" or "your work" that cannot be used or is less useful because:

    a.     It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous, or

    b.     You have failed to fulfill the terms of a contract or agreement;

        If such property can be restored to use by:

      (1)     The repair, replacement, adjustment or removal of "your product" or "your work;" or

      (2)     Your fulfilling the terms of the contract or agreement.

The Policies further define "your work" as:

    15. "Your work" means:

    a.     Work or operations performed by you or on your behalf; and

       b.      Materials, parts or equipment furnished in connection with such work or operations.

       "Your work" includes warranties or representations made at any time with respect to the fitness, quality, durability or performance of any of the items included in a. or b. above.

B.     <u>True Blue Golf & Racquet Resort</u>

7.     The True Blue Resort is a residential condominium complex located in Pawley's Island, Georgetown County, South Carolina. Construction on the True Blue Resort began in February 1997. The first building was completed on July 31, 1997. Construction on the True Blue Resort continued in ten separate phases, with the last building being completed on March 10, 2005. Ultimately, eighty-four (84) buildings were constructed at the True Blue Resort.

8.     Although eighty-four (84) buildings were constructed at the True Blue Resort, only seventy-seven (77) buildings were at issue in the Underlying Lawsuit.

9.     Certificates of Occupancy were issued for each of the buildings at the True Blue Resort on the following dates:

| Building | CO Date | Building | CO Date | Building | CO Date |
|---|---|---|---|---|---|
| 7 | 07/31/1997 | | | 72 | 07/16/2003 |
| 6 | 08/07/1997 | 54 | 12/21/1999 | 62 | 08/12/2003 |
| 2 | 08/14/1997 | 40 | 06/27/2000 | 64 | 09/04/2003 |
| 4 | 09/04/1997 | | | 74 | 09/12/2003 |
| 5 | 09/25/1997 | | | 63 | 10/03/2003 |
| 3 | 10/07/1997 | 41 | 12/28/2000 | 82 | 10/08/2003 |
| 1 | 11/25/1997 | | | 75 | 11/18/2003 |
| 10 | 05/05/1998 | | | 76 | 11/20/2003 |
| 9 | 05/05/1998 | 29 | 12/06/2001 | 81 | 11/21/2003 |
| 11 | 05/12/1998 | 39 | 12/21/2001 | 80 | 12/18/2003 |
| 8 | 05/29/1998 | 37 | 03/19/2002 | 77 | 01/21/2004 |
| 12 | 06/17/1998 | 38 | 04/26/2002 | 78 | 03/14/2004 |
| 13 | 08/03/1998 | 35 | 05/03/2002 | 83 | 03/19/2004 |
| 15 | 11/03/1998 | 30 | 06/28/2002 | 79 | 03/24/2004 |
| 17 | 11/09/1998 | 34 | 07/12/2002 | 84 | 04/14/2004 |
| 18 | 11/09/1998 | 32 | 08/01/2002 | 85 | 05/17/2004 |
| 14 | 11/16/1998 | 36 | 09/12/2002 | 86 | 06/14/2004 |
| 16 | 11/25/1998 | 31 | 09/20/2002 | 87 | 06/30/2004 |

| 19 | 12/04/1998 | | 33 | 09/27/2002 | | 88 | 07/21/2004 |
|----|------------|---|----|------------|---|----|------------|
| 21 | 12/15/1998 | | 28 | 12/20/2002 | | 90 | 08/13/2004 |
| 20 | 12/21/1998 | | 71 | 02/13/2003 | | 89 | 08/19/2004 |
| 22 | 05/11/1999 | | 73 | 02/13/2003 | | 97 | 09/14/2004 |
| 23 | 09/22/1999 | | 69 | 02/21/2003 | | 96 | 10/27/2004 |
| 24 | 10/20/1999 | | 70 | 03/06/2003 | | 95 | 11/24/2004 |
| 52 | 12/16/1999 | | 68 | 03/26/2003 | | 94 | 12/13/2004 |
| 53 | 12/16/1999 | | 67 | 05/21/2003 | | 93 | 01/06/2005 |
|    |            | | 66 | 05/30/2003 | | 92 | 02/03/2005 |
|    |            | | 65 | 06/19/2003 | | 91 | 03/10/2005 |

10.    The General Contractor for the buildings in the True Blue Resort was initially Pinehurst Builders, Inc.  From 1998 through 2002, Crossmann Communities, Inc. served as Developer and General Contractor.  From 2002 through the completion of the True Blue Resort in 2005, Beazer Homes served as Developer and General Contractor for all buildings at the True Blue Resort. Beazer is the successor-in-interest by merger to CCNC and Pinehurst, and the Court previously held in its [248] Order that Beazer had the same rights as CCNC under the Harleysville policy.[3]

C.    Litigation of the Underlying Lawsuit and The Coverage Action

11.    The unit owners at the True Blue Resort made complaints about construction deficiencies of the buildings located at the True Blue Resort in 2007.  Initial attempts were made by Beazer Homes to remediate the alleged problems and Structure Homes Builders, LLC, Georgetown Construction Services and other contractors were hired to perform repairs. However, the True Blue Golf & Racquet Resort Homeowners Association ("True Blue HOA") and unit owners were not satisfied with the repairs.

---

[3]    Pinehurst was a company in the business of real estate construction, and in May 1998, Pinehurst was merged into CCNC, which was at the time a subsidiary of its parent company, CCI.  By Agreement and Plan of Merger dated January 29, 2002, parent company Crossmann Communities, Inc. and its wholly-owned subsidiaries, including CCNC, merged with Beazer Homes Investment Corp.  [Crossmann Communities Inc., 2002 Form 8-K, ECF No. 195-10, pps. A-13 through A-14; PX-13.]  In addition to this merger at the parent company level, on January 1, 2005, CCNC merged into Beazer Homes Corp. ("BHC"). [Articles of Merger of Crossmann Communities of North Carolina, Inc. into Beazer Homes Corp., ECF No. 224-2; PX-18.]

12.    In May 2008, Beazer Homes hired L. Franklin Elmore and the law firm of Elmore & Wall, P.A. to assist it in responding to the construction defect claims made by the True Blue HOA and unit owners.

13.    On June 17, 2009, the Underlying Lawsuit was filed by the True Blue HOA regarding the improper development of the residential community, deficiencies in the construction and design of the buildings, and the inadequate and faulty repair of those buildings. The Amended Complaint was filed the next day, June 18, 2009.  [PX-208, 209.]  In its Amended Complaint, the True Blue HOA alleged that as a result of the initial construction and certain subsequent repairs of certain buildings, "…substantial parts of the buildings have been and will be continuously and repeatedly exposed to leaks causing moisture infiltration resulting in mold, rot, deterioration and degradation of the buildings." [PX-209, at pp. 7-8.]  In addition, the True Blue HOA alleged that "products either individually and/or aggregately defectively installed and/or defective at the time of installation have caused the buildings and various portions of the common elements to be continuously and repeatedly exposed to excessive moisture resulting in mold, mildew, rot, rust and degradation of the various component parts of the common elements of the buildings and other common elements."  [*Id*.]  The Amended Complaint was served on Beazer on June 29, 2009.  Under applicable South Carolina state court rules, Beazer had 30 days from service, or until July 29, 2009, to file an answer or appropriate motion addressing the Amended Complaint or else risk being defaulted in the case unless they obtained an extension of time.

14.    In the Underlying Lawsuit, the plaintiffs alleged eight causes of action against the defendants, specifically:  (1) negligence against Beazer Homes Corp. as developer; (2) breach of implied warranties and habitability and fitness for a particular purpose against Beazer Homes

Corp. as developer; (3) breach of express warranty against Beazer Homes Corp. as developer; (4) breach of fiduciary duty against Beazer Homes Corp. as developer; (5) negligence against Beazer Homes Corp. as initial general contractor; (6) breach of express and implied warranties against Beazer Homes Corp. as initial general contractor; (7) negligence against Structure Home Builders as repair general contractor; and (8) breach of express and implied warranties against Structure Home Builders as repair general contractor. In the Underlying Lawsuit, the plaintiffs sought actual, consequential, incidental and special damages, including the costs to repair, renovate, maintain and reconstruct the damaged buildings, loss of use of the buildings, diminution in value and punitive damages.

15.     The defendants in the underlying case were Beazer Homes Corp., Inc. and Structure Home Builders, LLC. Neither Pinehurst Builders, Inc. nor Crossmann Communities of North Carolina, Inc. was named as a defendant in the Underlying Lawsuit.

16.     Before the *True Blue Lawsuit* was filed, Beazer notified Harleysville of the True Blue HOA homeowners' contentions. Beazer asserts that it first notified Harleysville by letter dated November 29, 2007, but Harleysville officials deny receiving that letter. [*See* Nov. 29, 2007 Notice Letter, ECF No. 186-4.] The November 29, 2007 Notice Letter was admitted into evidence during trial. [PX-210]. Regardless, Beazer certainly notified Harleysville of the lawsuit by December 16, 2008 [Dec. 16, 2008 Ltr. from M. McNerney to D. Harris, ECF No. 276-4; PX-211.] Harleysville ultimately denied Beazer's request for indemnity by letter dated June 10, 2009. [June 10, 2009 Ltr. from D. Brown to M. McNerney, ECF No. 276-6, PX-213.]

17.     By letter dated June 26, 2009 [PX-214], Beazer's counsel forwarded a copy of the Amended Complaint in the *True Blue Lawsuit* to Mr. Derrick Harris, a Construction Defect Litigation Specialist employed by Harleysville who handles policyholder's claims for insurance

coverage.  [*Id*.]  In that letter, Beazer demanded that Harleysville defend Beazer against the claims in the *True Blue Lawsuit* in accordance with the duty to defend provision in the Harleysville Policy.  [*Id*.]

18.  Harleysville finally responded to Beazer's June 26, 2009 letter by letter dated August 24, 2009.  [PX-215.]  In that letter, Harleysville advised Beazer that Harleysville would defend Beazer in the *True Blue Lawsuit*, but only with respect to claims relating to Buildings 1-13 at the True Blue Project, which were the buildings that were constructed and for which certificates of occupancy were issued before expiration of the last Harleysville policy period.  Specifically, Harleysville advised Beazer that:

> The above referenced lawsuit alleges damages occurred as a result of construction deficiencies of the buildings involved in the project at issue and the later repair attempts at those same buildings.  The facts indicate that eighty-three (83) buildings were constructed at this particular project.  Of these eighty-three buildings, only thirteen (13) buildings were issued a certificate of occupancy within the periods of coverage provided by the Pinehurst Builders Policy.  Only damages resulting from the claims regarding those buildings whose certificates of occupancy were issued prior to the cancellation of the Pinehurst Builders Policy, subject to the terms, exclusions and definitions of the policy, would be potentially covered under the applicable policies.  Accordingly, **Harleysville specifically disclaims coverage for all damages arising from claims regarding construction defects of those buildings for which certificates of occupancy were issued after the Pinehurst Builders Policy was cancelled on August 29, 1998 and all claims regarding the remediation, repair and replacement of all 83 buildings.  All coverage for the buildings whose certificates of occupancy were issued after August 29, 1998 and all coverage for all remediation, repair and replacement of all 83 buildings, including the duty to defend and to indemnify, are hereby disclaimed.**

[PX-215, p. 9 (bold type in original).]

19.  After obtaining a 30 day extension to answer the Complaint on behalf of Beazer, on August 27, 2009, Mr. Elmore of Elmore Goldsmith filed an answer to the amended complaint in

the *True Blue Lawsuit* on behalf of Beazer.[4]    [PX-735.]    Mr. Elmore is an experienced construction law defense lawyer who is an active member of a number of national and state construction law-focused organizations. The Court finds that Mr. Elmore and his firm were well qualified to defend Beazer in the *True Blue Lawsuit*.

20.   By letter dated September 23, 2009, Beazer advised Harleysville that it disagreed with Harleysville's disclaimer of its duty to defend claims related to Buildings 14-83 at the True Blue Project.   [PX-216.]   Beazer's September 23, 2009 letter asked Harleysville to reimburse Beazer for all of its defense costs in the *True Blue Lawsuit* and attached a draft of the Third-Party Complaint that Beazer eventually filed against Harleysville in this coverage action.   [*Id.*, at Ex. C.]

21.   By letter dated September 25, 2009 [PX-217], Harleysville's counsel wrote Beazer to reiterate the position set forth in Harleysville's August 24, 2009 letter [PX-215] that Harleysville would defend only those claims in the *True Blue Lawsuit* related to Buildings 1-13 of the True Blue Project.   [*Id.*]

22.   On September 24, 2009, a month after Beazer's Answer to the Amended Complaint in the *True Blue Lawsuit* was filed, Harleysville communicated with Charleston, South Carolina attorney Mr. Stephen Brown of Young Clement Rivers LLP ("YCR") about representing Beazer in the *True Blue Lawsuit* to defend against the claims relating to Buildings 1-13.   [PX-667.]   On October 1, 2009, Harleysville sent Mr. Brown a retention letter for this engagement, which stated as follows:

Assignment Instructions:

---

[4]        When Mr. Elmore was retained to represent Beazer in the *True Blue Lawsuit*, Mr. Elmore was a partner in the Elmore & Wall law firm.  During the pendency of the *True Blue Lawsuit* and this action, Mr. Elmore withdrew from Elmore & Wall to start the firm Elmore Goldsmith.  Unless otherwise delineated herein, the Court's reference to "Elmore Goldsmith" refers to that Firm and Elmore & Wall.

1.) Upon receipt of the file, please review and file the appropriate answer to protect the interests of the named insured. Although the named insured is not specifically listed as a defendant in the complaint, the complaint alleges "Beazer Homes, as the surviving Corporation and Successor in Interest to Crossman Communities of North Carolina, Inc., which merged with Pinehurst Builders Inc." Accordingly you are instructed to enter an appearance, answer and defend Beazer Homes as a successor in interest to the named insured.

2.) It is understood at this time the insured was the general contractor for a certain number of the total Buildings claimed involved in the complaint. At this time, it is believed that Buildings 1-13 were to have been constructed by the insured. <u>Therefore, your defense efforts should be concentrated to those specific buildings only.</u>

[PX-715, at p. 1 (emphasis added).]

23. By letter dated October 9, 2009 [PX-218], Beazer reiterated to Harleysville that it disagreed with Harleysville on the scope of Harleysville's duty to defend Beazer in the *True Blue Lawsuit*, and that "Beazer Homes believes that Harleysville must defend the entire case," citing to the South Carolina Supreme Court's 1997 opinion in *Town of Duncan v. State Budget & Control Board*, 326 S.C. 6, 16 (1997), and the 1977 opinion in *Sloan Constr. Co. v. Central National Ins. Co.*, 269 S.C. 183, 187 (S.C. 1977).

24. By letter dated October 29, 2009 [PX-220], Harleysville advised Beazer that "[l]iabilities incurred by other entities [ostensibly for the construction of Buildings 14-83] not named as insured or entities that do not otherwise qualify for coverage do not trigger coverage and accordingly no defense is owed in relation to those buildings [Nos. 14-83]." [*Id.*]

25. On November 10, 2009, six weeks after receiving the October 1, 2009 retention letter from Harleysville, Mr. Stephen Brown and YCR filed a Notice of Appearance of Additional Counsel in the *True Blue Lawsuit*. [PX-732.] That Notice stated that YCR "will hereby appear as additional counsel of record for Beazer Homes Corp., Inc. only in its capacity as Successor in

interest to Crossman (sic) Communities of North Carolina, Inc. doing business as Pinehurst Builders and Pinehurst Builders, Inc." [*Id.*]

26.  At no time did Harleysville advise Beazer or Elmore Goldsmith that YCR would be lead defense counsel for Beazer in the *True Blue Lawsuit* or that Beazer should transfer the litigation files for the *True Blue Lawsuit* to YCR because YCR would be lead counsel.

27.  Harleysville has issued written guidelines for its outside counsel that are retained to represent Harleysville insureds and requires Harleysville-retained lawyers to comply with those guidelines.  [S. Brown Depo., at 99:10-99:18.]  In those guidelines, Harleysville dictates to outside counsel the procedures that defense counsel must comply with in order to obtain payment for attorneys' fees and costs by Harleysville.  [*Id.*]  Harleysville never sent a copy of these outside counsel guidelines to Elmore Goldsmith or Beazer, nor did Harleysville ever advise Beazer or Elmore Goldsmith that they had to comply with the Harleysville guidelines for outside counsel.  Moreover, Harleysville never offered any guidance, suggestions, or recommendations to Elmore Goldsmith or to Beazer regarding what Harleysville believed was the appropriate manner for Beazer to defend the *True Blue Lawsuit*.

28.  In the summary judgment briefing, Harleysville asserted that it was "defending Beazer Homes Corp., under a reservation of rights, for all claims (those potentially covered and those which are not covered) arising out of the buildings that were completed prior to the termination of the Harleysville Policies.  In this way, Harleysville is fulfilling its defense obligations to Beazer Homes Corp. by defending all claims regarding those buildings which may implicate its coverage." (ECF No. 194, p. 18). The deposition of attorney Stephen Brown was taken in August of 2013, almost two years after the summary judgment hearing in September 2011. He testified that YCR was to defend Beazer against all claims in the *True Blue Lawsuit*,

13

and not just claims related to Buildings 1-13.  The Court finds that this contention is inconsistent

with the other evidence.  In addition to the plain meaning of the communications summarized in

paragraphs 18 - 26 above, the Court notes that:

- Mr. Luther McCutchen III, the lead counsel for the plaintiff in the *True Blue Lawsuit*, was approached by a Harleysville representative and was requested to make a settlement demand for the property damage to Buildings 1-13.  Mr. McCutchen made a demand and received a counterproposal, which the True Blue HOA rejected.

- YCR's written status reports to Harleysville for the *True Blue Lawsuit* -- which were never sent to YCR's client, Beazer -- contain numerous assessments of the damages sought by the True Blue HOA against Beazer, but only with respect to Buildings 1-13. [*See*, *e.g.*, PX-723, at pp. 2-10; PX-719.]

- A number of references in YCR's status reports to Harleysville indicate that YCR did not review or assess certain evidence in the *True Blue Lawsuit* because such evidence pertained to buildings other than Buildings 1-13 at True Blue.  [*e.g.*, PX-718, pp. 2-3 ("we have not reviewed the original construction documents to determine if the [construction] deficiency is a design error or a construction defect, however, the repairs were made in Buildings 14, 16, 20, 22, 23, 24, 28, and 29, all of which were certified for occupancy after the [Harleysville] policy period ended.").]

29.  The Court found in its March 27, 2013 Duty to Defend Order that the limited scope

of Harleysville's retention of Mr. Stephen Brown and YCR regarding buildings 1-13 did not

extend to defending Beazer against all claims in the *True Blue Lawsuit*, and the evidence at trial

further confirmed that finding.

30.  However, Mr. Brown and attorneys from his firm did actively participate in the

litigation of the Underlying Lawsuit, including attending depositions and court hearings.  Mr.

Brown and attorneys from his firm assisted Mr. Elmore and his law firm with reviewing and

coding documents and other tasks that they were asked to perform by Mr. Elmore.  Young

Clement Rivers attorneys attended numerous inspections of the property. Mr. Brown met with Mr. Elmore to discuss strategy in the Underlying Lawsuit and the best course of action to take in defending the lawsuit.

31. Harleysville paid for all efforts undertaken by Mr. Brown and the law firm of Young Clement Rivers to defend Beazer Homes in the Underlying Lawsuit. Harleysville paid Young Clement Rivers $184,719.79 in attorneys' fees and $6,091.06 in expenses, for a total payment of $190,810.85. Including the other expenses paid by Harleysville, such as court reporter fees, Harleysville paid a total of $222,113.59 in defense of the Underlying Lawsuit with respect to the thirteen buildings.

32. Beazer Homes hired the law firm of Bellamy, Rutenberg, Copeland, Epps, Gravely & Bowers, P.A. to represent it with regard to its claims against three subcontractors, specifically Universal Forest Products Eastern Division, Inc., Weaver Co., and Upon the Rock Construction, Inc. Mr. Elmore indicated that his law firm had a conflict with those subcontractors and could not represent Beazer Homes with regard to its claims against those three subcontractors.

33. On March 5, 2010, on behalf of Beazer Homes, the law firm of Bellamy, Rutenberg, Copeland, Epps, Gravely & Bowers, P.A. filed a separate lawsuit (Case No. 2010-CP-22-0379) against Universal Forest Products Eastern Division, Inc., Weaver Co., and Upon the Rock Construction, Inc. for claims arising out of the construction of the True Blue Project. This case was consolidated with the Underlying Lawsuit on December 3, 2010.

34. The Court finds that it was reasonable for Beazer Homes to hire the law firm of Bellamy, Rutenberg, Copeland, Epps, Gravely & Bowers, P.A. to represent it with regard to its claims against Universal Forest Products Eastern Division, Inc., Weaver Co., and Upon the Rock Construction, Inc. arising from the construction of the buildings at the True Blue Resort, in light

15

of Harleysville advising Beazer of the limited defense of the thirteen buildings.

35. In addition to tendering the Underlying Lawsuit to Harleysville, Beazer Homes also tendered the Underlying Lawsuit to the following insurance carriers who issued policies of insurance to Beazer Homes:  Cincinnati Insurance Company; Illinois Union Insurance Company; and certain London-based insurers.  Beazer Homes sought both a defense and indemnity from each of these insurers in connection with the Underlying Lawsuit.

36. Beazer Homes also tendered the Underlying Lawsuit for defense and indemnity to the insurance companies who issued policies of insurance to numerous subcontractors and under which policies Beazer Homes claimed complete coverage for itself as an additional insured. Beazer Homes sought both defense and indemnity from each of these insurers in connection with the Underlying Lawsuit.

37.  The only carrier who retained counsel to defend Beazer Homes as to any portion of the Underlying Lawsuit was Harleysville.

38. The carrier for two subcontractors, and under which Beazer Homes sought coverage as an additional insured, did not retain counsel to defend Beazer Homes.  However, it did reimburse Beazer Homes $79,390.51 in defense costs incurred in the Underlying Lawsuit in a confidential settlement.

39.  Shortly before the December 2012 trial was to begin, on November 21, 2012, Beazer and the subcontractor-defendants reached an agreement to settle the Underlying Lawsuit. Pursuant to that agreement, and after final settlement agreements were executed, Beazer paid the True Blue HOA a total of $3,336,800 to settle the *True Blue Lawsuit*.  [Beazer-True Blue HOA Settlement, PX-223; Beazer Settlement Check, PX-225; Beazer Settlement Check, PX-706; closing  argument  before  the  Court]    Subcontractor-defendants  paid  the  True  Blue  HOA

additional amounts to settle claims against them.  The litigation efforts by Beazer against various True Blue subcontractors resulted in those subcontractors paying approximately $2.8 million directly to the True Blue HOA to settle claims by the True Blue HOA, which resulted in a lower settlement amount for Beazer than would have been the case had Beazer not pursued the subcontractors. Beazer Homes tendered a settlement check to the counsel for the Plaintiffs in the Underlying Lawsuit on January 17, 2013. The Underlying Lawsuit was dismissed with prejudice as to Beazer Homes Corp.

40. Beazer recovered insurance proceeds from third parties other than Harleysville [PX-749 to PX 756.]  Some of the individual amounts paid to Beazer by the other insurers are set forth in confidential settlement agreements or other confidential documents.  In the aggregate, Beazer recovered a total of $3,045,391 from other insurance carriers. This includes $79,391 set forth above which was specifically allocated to defense costs.

41.     Beazer Homes spent a total of $2,572,522.05 in attorneys' fees and costs to defend Beazer Homes Corp. in the Underlying Lawsuit.

42.     Beazer Homes introduced into evidence the deposition of Mr. Elmore, who defended the Underlying Lawsuit and who testified concerning the claimed fees and expenses. Mr. Elmore's deposition revealed that his hourly rate was $300; that the hourly rate of other partners in the firm was $250; that the hourly rate for associates was $175; and that the hourly rate for paralegals was $125.

43.     Beazer did not offer any expert witnesses to opine that the claimed fees were reasonable and necessary. It did provide the Court with orders of the United States Bankruptcy Court approving attorney hourly rates in excess of Mr. Elmore's rates.  While these orders were admitted without objection, the Court has given limited weight to them because they do not deal

with a similar area of practice.  However, the Court notes that the rates charged by Mr. Elmore's firm were approved by Beazer, and the bills were for the most part approved for payment after review by the third party administrator and the Beazer official, Mr. Fisher.  Importantly, also, the hourly rate charged by partners at the Bellamy law firm ($300) was the same as charged by Mr. Elmore.  Plaintiff's exhibit 267 (Bellamy firm invoice to Beazer) indicates an hourly rate by "DBM", who the Court assumes is David B. Miller, at $300 per hour; "GWR", which appears to be an associate rate of $175 per hour; and "PAK" which the Court assumes is a paralegal rate of $70 per hour.  (PX 267, Bates stamp 352).

44.     Harleysville offered evidence through attorney Stephen Brown's deposition (based on the hourly rate that Harleysville agreed to pay him) that an hourly rate of $155 per hour was reasonable and customary in defending similar construction defect cases in South Carolina.  No Harleysville employee testified at trial.

45.  Harleysville offered evidence through attorney Stephen Brown that a reasonable fee for defending the entire case would have been no more than $500,000.00.

46.  The reasonableness and necessity of attorneys' fees and related costs to defend a lawsuit depends in large part on the nature of the specific lawsuit to be defended.  In that regard, complex, high exposure, multi-party lawsuits involving substantial document and other discovery issues with many expert witnesses will, in general, be more costly to defend than low exposure, relatively straight-forward cases with few parties and little document or expert discovery.

47.  The *True Blue Lawsuit* presented a large exposure for Beazer.  The True Blue HOA sought a compensatory damages award against Beazer in an amount exceeding $23 million.

[PX-716]   Harleysville's appointed counsel, Mr. Stephen Brown, advised Harleysville of this large financial exposure to Beazer, and also advised Harleysville that:

- The True Blue HOA's counsel, Mr. Luther McCutcheon and Pat O'Day, "are very experienced in construction litigation, and are very competent trial lawyers." [PX-716, at p. 3.]

- "A jury will likely award 60 to 80 percent of the cost of remedial construction [, and] [p]unitive damages are a high probability if this matter is tried." [*Id.*]

- The True Blue HOA's primary damages expert witness, Mr. Derek Hodgin, was a very credible testifying expert. [PX-737, at p. 13.]

These factors and others show that the *True Blue Lawsuit* posed a very large financial risk to Beazer.

48.  The Court also finds that the *True Blue Lawsuit* required significant time and effort in discovery, including document and expert witness discovery.   Harleysville's appointed counsel, Mr. Stephen Brown, Beazer's lead counsel, Mr. Elmore, and the plaintiff HOA's counsel, Mr. McCutchen, joined in a motion asking the state court to designate the *True Blue Lawsuit* as a "Complex Case" under the South Carolina state court rules.   There were approximately 50 different parties in the case, which increased complexity of the discovery, expert witness, and liability issues.  Several witnesses testified at trial that Beazer's documents relevant to the True Blue Project were located in a number of different locations and were not organized by project, which made collection and review of potentially relevant documents more time consuming.  Lead counsel for the True Blue HOA testified that in the more than 30 years that he has represented plaintiffs in construction defect litigation, the *True Blue Lawsuit* was one of the most complex cases he had handled.

49.  The Court finds that the hourly rates charged by Elmore Goldsmith to defend Beazer in the *True Blue Lawsuit* were reasonable.  Although Harleysville contends that its retained counsel, YCR, has a much lower rate structure than Elmore Goldsmith, this fact does not render the hourly rates charged by Elmore Goldsmith unreasonable.  Mr. Elmore has extensive experience in construction litigation; another construction lawyer (David Miller of the Bellamy firm) charged the same hourly rate; and the fee rate structure was actually charged by Elmore and was not disputed as unfair or unreasonable by Beazer, whose national claims manager had experience in the claims arena.  Additionally, the bills were scrutinized by a third party administrator, Helmsman.

50.  Evidence presented at trial also demonstrated that Beazer incurred significant costs associated with defense of the *True Blue Lawsuit* that it does not seek from Harleysville.  Mr. Fisher testified that Beazer only billed one-third of the cost of the document review and coding project to the matter file for defense of the *True Blue Lawsuit*.  Beazer equally split that document review and coding costs among the different cases for True Blue, Fairways, and St. Andrews (two other matters related to the Pinehurst/Crossmann/Beazer mergers), even though the majority of the documents to be reviewed and coded dealt with True Blue.  Mr. Fisher and Mr. Moore also testified that Beazer paid substantial sums to the Elmore Goldsmith firm and to Mr. Moore for professional services rendered before the *True Blue Lawsuit* was filed.  Those pre-lawsuit fees helped the Elmore Goldsmith firm and Mr. Moore gain a foundation of knowledge about the True Blue Project.  Finally, Mr. Fisher testified that Beazer retained and paid for a contract attorney and a contract paralegal at its own expense to help review documents related to the True Blue Project and the *True Blue Lawsuit*.

20

51.   In addition, the record shows that Harleysville never communicated with either Beazer or Elmore Goldsmith to advise Beazer what hourly rates for defense counsel Harleysville considered reasonable for the *True Blue Lawsuit*.  Harleysville also never notified Beazer or Elmore Goldsmith as to the specific defense-related tasks that Harleysville believed were necessary and reasonable and those that Harleysville believed were unnecessary or unreasonable. Harleysville knew in 2009 that Beazer was seeking an award of defense costs for the *True Blue Lawsuit* in this insurance coverage action.  It would have been simple for Harleysville to advise Beazer and Elmore Goldsmith that, in the event Beazer prevailed on its duty to defend claims against Harleysville in this action, Harleysville would only pay hourly rates for defense lawyers at a certain level, and that hourly rates charged above that level would be challenged as unreasonable by Harleysville.   Similarly, Harleysville could have advised Beazer in 2009 regarding other guidelines for the defense of the case that Harleysville believed were reasonable.

52.   At trial, Beazer introduced into evidence copies of all the invoices it received from attorneys, court reporters, expert witnesses, and others showing the amounts billed to and paid by Beazer to defend the *True Blue Lawsuit*.  [PX-226 to PX-504.]  Beazer also presented evidence at trial about the third-party claims administrator, Helmsman Claims Management, employed by Beazer during the pendency of the *True Blue Lawsuit*.  Mr. William Fisher, Beazer's National Claims Manager until he left Beazer in March 2013, testified that both he and Helmsman contemporaneously reviewed all of the invoices for attorney's fees and costs before they were approved for payment.  The Court finds that the defense costs detailed in these invoices were reasonable. The evidence presented at trial showed that Beazer paid $2,493,131[5] in unreimbursed

---

[5] The total fees and costs were $2,572,522.05.  However, Beazer was reimbursed $79,391 toward defense costs from another carrier.

attorneys' fees and related costs to defend the *True Blue Lawsuit*.  [Summary Chart of Defense Costs, PX-226; Settlement Agreement PX-751, p.1.

53.   The Court finds that Beazer presented sufficient evidence supporting its claim that the attorneys' fees and related costs to defend the *True Blue Lawsuit* were both reasonable and necessary.

D.      Beazer Homes' Settlement With Other Insurance Carriers for Defense and Indemnity Of The Underlying Lawsuit

54.      In 2012, Beazer Homes made demand on certain London-based insurers for reimbursement of the defense costs it incurred and the settlement it paid in the Underlying Lawsuit.  As a result, Beazer Homes received $1,100,000 from the London-based insurers. According to the trial testimony of William Fisher, former national claims manager for Beazer Homes, the settlement with the London-based insurers was for defense costs and indemnity, but no allocation was made as to what portion of the settlement was for defense costs and what portion was for indemnity.

55.      After Beazer Homes settled the Underlying Lawsuit, Beazer Homes made demand on Cincinnati Insurance Company for reimbursement of the defense costs Beazer Homes incurred and the settlement it paid in the Underlying Lawsuit.  As a result, Cincinnati and Beazer Homes entered into a settlement agreement in which Cincinnati agreed to pay Beazer Homes $626,000.  This settlement covered both defense costs and indemnity, but the agreement did not allocate what portion was for each.

56.      After Beazer Homes settled the Underlying Lawsuit, it made demands on multiple insurance carriers that issued policies of liability coverage to various subcontractors, under the Additional Insured endorsements in those policies, for reimbursement of defense costs it incurred and the settlement it paid in the Underlying Lawsuit.  As a result, Beazer Homes entered into

settlement agreements with insurance carriers for four (4) subcontractors for a total confidential settlement amount of $1,240,000 (deducting the $79,391 which was specifically allocated to defense costs and has been deducted from the amount that Beazer is requesting as explained in Paragraph 52 hereinabove).

57.     To determine what portion of these additional settlements should be allocated to reimbursement of defense costs and what portion of these additional settlements should be allocated to reimbursement of those amounts paid by Beazer Homes to settle covered damages , this Court finds:  The total settlement paid by Beazer to True Blue was **$3,336,800**, which included both covered and non-covered damages.  (Repairs were also made by Beazer before the lawsuit was brought, but the cost of the repairs have not been included in connection with the Court's analysis relating to defense costs because they were not made in reference to the lawsuit.)  The total of Beazer's unreimbursed attorney's fees (after deduction of $79,390.51 paid by a carrier for two (2) subcontractors which was specifically allocated to defense costs) was **$2,493,131**.  The total out of pocket cost to Beazer for the lawsuit was therefore **$5,829,931**.

The amount of unreimbursed attorney's fees ($2,493,131) is 43% of the total Beazer expense of $5,829,931.  Therefore, the Court believes that a reasonable method of allocating the defense costs and indemnity costs from the other gross settlements received from the other carriers is to allocate 43% ($1,275,380) to defense costs. This allocation provides justice between Beazer and Harleysville.

This computation is set forth below:

| Carrier | Total settlement | Amount Court allocates to Defense costs (43%) |
|---|---|---|
| Confidential settlement | $140,000 | $60,200 |
| Confidential settlement | $140,000 | $60,200 |
| Confidential settlement | $460,000 | $197,800 |
| Confidential settlement | $500,000 | $215,000 |

| | | |
|---|---|---|
| Lloyd's of London | $1,100,000 | $473,000 |
| Cincinnati | $626,000 | $269,180 |
| TOTAL | $2,966,000 | $1,275,380 |

E.  Evidence Regarding Property Damage At The True Blue Project

58.   The Parties submitted evidence at trial regarding the nature and causes of damage to the buildings at the True Blue Project.  A number of the photographs of property damage and rot resulting from water intrusion and other damage to buildings, together with the testimony of the Parties' experts, establish that defective construction of various components of the buildings allowed moisture to penetrate into the buildings, and this moisture resulted in damage to interior portions of the buildings that were previously undamaged.  There was some water intrusion damage to non-defective component parts that was caused by negligent or faulty construction ("covered damages"). The Court finds that the cause of the water-related property damage at the True Blue Project was defective work by certain subcontractors of Beazer that allowed moisture to penetrate into portions of the buildings.  The total and cumulative effect of this moisture intrusion caused damage to the buildings for which the plaintiffs in the *True Blue Lawsuit* sought redress against Beazer.

59.   Beazer's expert, Mr. Moore, credibly testified that damage began at the time of the first rain and progressed continually from that point forward.  No evidence was presented as to when the first rain occurred.  Harleysville's expert, Mr. Mathis, testified only as to when he thought repairs were necessary, not the time the water intrusion damage actually began.  He testified it would be three (3) years before repair of wood products would be necessary. The summary charts prepared by Harleysville and used at trial in its closing argument showed the property damage starting thirty days after the date the Certificate of Occupancy was issued for each building.  Without any other definite date being suggested for the date when the damage

began, other than the date the certificate of occupancy was issued (which the Court rejects), the Court will utilize the date as to each building which is 30 days after the date the Certificate of Occupancy was issued for each building.

60.   The parties also dispute the date on which the damage ended.  Beazer asserts that it ended on the date the True Blue lawsuit was filed.  Harleysville contends the damages continued to occur until the date of the settlement check.  Because the evidence showed that the damage continued to occur during the lawsuit, the Court finds that the date on which the damage ended was January 17, 2013, the date of the settlement check paid by Beazer to True Blue.

61.  The Parties presented evidence at trial regarding the necessary cost to repair the damage at Buildings 1-13, for which Beazer claimed at trial are the buildings at True Blue to which Harleysville's duty to indemnify applies.  Beazer's expert, Mr. Richard Moore, testified that the reasonable cost to repair the resulting property damage at Buildings 1-13 was no less than $660,000.  His analysis was based upon (1) several dozen site investigations, including site investigations of the current repair work being conducted at True Blue; (2) destructive testing; (3) a review of the True Blue HOA experts' field notes, reports, and several thousand photographs produced in the *True Blue Lawsuit*; and (4) the True Blue HOA experts' repair scope and costs of repair estimates produced in the *True Blue Lawsuit*, including the repair scope and cost of repair estimates for Buildings 1 through 13.

62. Harleysville's expert, Mr. Sidney Mathis, testified that in his opinion the cost to repair the resulting damages for Buildings 1-13 at the True Blue Project was $390,588.38.  His testimony was based upon his interpretation of a pre-litigation June 2008 report prepared by the HOA's expert in the *True Blue Lawsuit*.  Mr. Mathis' analysis did not involve any destructive testing, any review or analysis of the four subsequent reports by the HOA's expert, any review or

analysis of the HOA expert's field notes or photographs, any review or analysis of the scope of repair or cost estimates produced in the *True Blue Lawsuit*, or any review or analysis of photographs produced in the underlying case by the cost of repair contractor, Beazer's expert, or other experts.

63.  The evidence showed that Mr. Moore spent a great deal of time on site at the True Blue Project from 2009 through 2012, and that he was personally involved with repair contractors, scope of work professionals, and others who investigated the damage to the buildings at the True Blue Project and assessed the likely cost of repairs. However, Moore admitted that some of his estimate includes the cost to repair defective work rather than resulting damages.

64.  The evidence also showed that Mr. Mathis based his analysis and opinion primarily on only one of several cost estimates prepared by Construction, Science, & Engineering, Inc. ("**CSE**"), and that the CSE estimate upon which he based his analysis was not the most recent CSE estimate.  The Court finds that the truth regarding the cost to repair lies somewhere between the figures provided by the two experts. The court averages the two figures and finds that the cost to repair resulting property damage at Buildings 1-13 at the True Blue Project is $525,294. No evidence was presented as to the proportion of the damage for each building.  Therefore, the Court finds that the cost to repair each of the 13 buildings was $40,407, which is calculated by dividing the total cost of repair of $525,294 by 13 buildings.

F.    Attorneys' Fees In Present Action

65.    The present action was initiated by Cincinnati.  After Beazer responded to the allegations asserted against it by Cincinnati, it filed a Third-Party Complaint against Harleysville.

26

66.    Beazer brought two claims against Harleysville in the present action:  (1) breach of contract; and (2) declaratory judgment.  Beazer Homes did not assert nor present any evidence of a bad faith claim against Harleysville in this case.

## CONCLUSIONS OF LAW

A.    Coverage under the Harleysville Policies

It is axiomatic that an entity seeking coverage under a policy of insurance bears the burden of proving that the claims alleged against it and the damages paid fall within the grant of coverage provided by that policy. *Spartan Petroleum Co. v. Federated Mut. Ins. Co.*, 162 F.3d 805, 811-12 (4th Cir. 1998); *Auto-Owners Ins. Co. v. Madison at Park West Prop. Owners Ass'n*, 2011 WL 2669665 (D.S.C. 2011); *Gamble v. Travelers Ins. Co.*, 251 S.C. 98, 160 S.E.2d 523, 525 (1968).  Beazer Homes has met its burden to show that the claims alleged and damages paid in the Underlying Lawsuit fall within the coverage provided by the Harleysville Policies.

Insurance contracts are "subject to 'the general rules of contract construction,' and '[i]f the contract's language is clear and unambiguous, the language alone determines the contract's force and effect,' but '[w]here language used in an insurance contract is ambiguous, or where it is capable of two reasonable interpretations, that construction which is most favorable to the insured will be adopted.'"  *Goldston v. State Farm Mut. Auto. Ins. Co.*, 358 S.C. 157, 170, 594 S.E.2d 511, 518 (S.C. App. 2004); *see also Poston v. Natn'l Fidelity Life Ins. Co.*, 303 S.C. 182, 399 S.E.2d 770 (1990).

The Policy provides that Harleysville must "pay those sums that [Beazer] becomes legally obligated to pay as damages because of… 'property damage'…" caused by an "occurrence" during the period the Policy is in effect.  [Harleysville Policy, ECF No. 187-10, PX-4, p. 00140.]  "Property damage" is defined as "[p]hysical injury to tangible property,

including all resulting loss of use of that property," and "loss of use of tangible property that is not physically injured." [*Id*. at 48.] "Occurrence" is defined as an "accident, including continuous or repeated exposure to substantially the same general harmful conditions." [*Id*.]

The Harleysville Policy has a standard "duty to defend" provision that gives Harleysville the right, and imposes upon Harleysville the duty, to defend Beazer in any lawsuit that seeks damages that may potentially be covered under the Policy [PX-4, P. 00140], even if the lawsuit is frivolous. Under South Carolina law, a primary insurer's duty to defend is a separate duty from, and is much broader than, its duty to indemnify. See, e.g., *Ross Dev. Corp. v. Fireman's Fund Ins. Co.*, 2:08-3672-MBS, 2011 WL 3654510 at *5 (D.S.C. Aug. 19, 2011); *Union Ins. Co. v. Soleil Group, Inc.*, 465 F. Supp. 2d 567, 575 n.3 (D.S.C. 2006). This Court held in its March 27, 2013 Order that Harleysville had a duty to defend Beazer in the *True Blue Lawsuit* and that Harleysville breached its duty to defend. [ECF No. 248, p. 23.]

"Negligent or defective construction resulting in damage to otherwise non-defective components may constitute 'property damage,'" covered under the Harleysville Policy. *Crossmann Communities of North Carolina, Inc. v. Harleysville Mutual Insurance Co.*, 395 S.C. 40, 50, 717 S.E.2d 589, 594 (2011). As discussed further below, negligent or defective construction by various subcontractors hired by Beazer resulted in water damage to otherwise non-defective components of the buildings at the True Blue Project. Some of the resulting water damage took place during the period the Harleysville Policy was in effect, and that damage is covered under the Harleysville Policy unless an exclusion in the Harleysville Policy applies. The cost to repair resulting water-related property damage at the True Blue Project that occurred during the Harleysville Policy is covered damage, and Harleysville must indemnify Beazer for that damage. *Id*.

An insurance company that denies coverage based on an exclusion in the policy bears the burden of establishing the factual basis for application of the exclusion, and the Court is required to interpret the language of a coverage exclusion in favor of coverage and against the insurer. *Owners Ins. Co. v. Clayton*, 614 S.E.2d 611 (S.C. 2005) ("[I]nsurance policy exclusions are construed most strongly against the insurance company, which also bears the burden of establishing the exclusion's applicability."). The Court finds that Harleysville has not met its burden of proof regarding the applicability of any exclusions.

Harleysville argues that the "impaired property" exclusion in the Harleysville Policy bars coverage, but Harleysville's argument is without merit.   The Harleysville Policy excludes coverage for:

> n.    "Property damage" to "impaired property"… arising out of:
>
> (1)    A defect, deficiency, inadequacy or dangerous conditions in "your product" or "your work," or
>
> (2)    A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

[Harleysville Policy, ECF No. 187-9, at p. 0038-39; PX-3.]   "Impaired property" is defined in the Harleysville Policy as follows:

> 5.    "Impaired property" means tangible property, other than "your product" or "your work" that cannot be used or is less useful because:
>
> a.    It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous, or
>
> b.    You have failed to fulfill the terms of a contract or agreement; If such property can be restored to use by:
>
> (1)    The repair, replacement, adjustment or removal of "your product" or "your work"; or
>
> (2)    Your fulfilling the terms of the contract or agreement.

[*Id*. at p. 0044.]

The impaired property exclusion bars coverage for the cost to repair negligently constructed work itself, not resulting water damage to otherwise properly installed or constructed components of buildings. *Auto Owners Ins. Co. v. Newman*, 684 S.E.2d 541 (S.C. 2009). In *Newman*, the South Carolina Supreme Court found that an impaired property exclusion similar to that in the Harleysville Policy only prohibits recovery for the cost of removing and replacing the defectively installed stucco. During closing arguments, Harleysville referenced the recent decision by the South Carolina Supreme Court in *Bennett & Bennett Construction, Inc. v. Auto Owners Insurance Company*, 2013 WL 3723214 (S.C. July 17, 2013), in support of its argument that the impaired property exclusion in the Harleysville Policy precludes any duty to indemnify Harleysville may have in this case. The Court concludes that *Bennett & Bennett* does not change the rule outlined in *Newman*. In *Bennett & Bennett*, "the insured contracted to install a decorative brick face, and the aesthetic characteristics of the brick were an important aspect of the contract." *Id*. at p. *4. When "[t]he brick face was replaced because of a deficiency in its aesthetic characteristics," the Court found that the cost to replace the improperly installed brick face was excluded under the impaired property exclusion. *Id*. Accordingly, in *Bennett & Bennett* the Court found the impaired property exclusion prohibited recovery for defective work itself. The cost to repair property damage at the True Blue Project included costs to repair water damage to otherwise properly installed or constructed components that resulted from the negligence of certain subcontractors retained by Beazer. In addition, testimony from Mr. Moore, Ms. Sidden, Mr. Graham, and Mr. McCutchen established that, notwithstanding the property damage at the True Blue Project, the individual units at True Blue remained in use and were not

less useful. Therefore, the impaired property exclusion does not bar coverage under the Harleysville Policy.

To the extent that Harleysville may have arguably raised that the policy contained a "consent to settlement" clause requiring Beazer to obtain Harleysville's consent before settling the underlying lawsuit, the Court believes that, first, this was not properly raised, and secondly (even if it was), Harleysville should be estopped from asserting it due to their refusal to provide a complete defense to Beazer. Additionally and certainly, there is no evidence whatsoever of any collusion between Beazer and True Blue. *See Pickett v. Fidelity & Cas. Co.*, 60 S.C. 477, 38 S.E. 160, 161 (1901).[6]

No exclusion in the Harleysville Policy bars coverage, and Harleysville must indemnify Beazer in accordance with the *pro rata* time-on-risk method outlined in *Crossmann Communities of North Carolina, Inc. v. Harleysville Mutual Insurance Co.*, 717 S.E.2d 589 (S.C. 2011).

B.    Beazer Homes Is Only Entitled To Be Indemnified By Harleysville For Harleysville's Time-on-risk Portion Of The Covered Damages.

The South Carolina Supreme Court has held that negligent or defective construction resulting in damage to otherwise non-defective components of a building constitutes "property damage" caused by an "occurrence" as those terms are defined in a general liability insurance policy; whereas improper or faulty construction, including code violations, missing component parts, improper choice of component materials, defective design, failure to adhere to building plans and specifications, and failure to adhere to manufacturer specifications, fail to meet the insurance policy's definition of "property damage" and are therefore not covered under the provisions of a commercial general liability policy. As the *Crossmann* Court noted:

In sum, we clarify that negligent or defective construction resulting in

_____

[6] To the extent that Harleysville raised again at trial the applicability of the anti-assignment clause, the Court adopts its prior holding that it does not apply. *See* Order [248] at p. 9.

damage to otherwise non-defective components may constitute "property damage," but the defective construction would not.

*Crossmann*, 395 S.C. at 50, 717 S.E.2d at 594.  Accordingly, Harleysville would only be liable to indemnify Beazer Homes for that portion of the settlement that Beazer Homes paid to settle damages for which coverage is provided under the Harleysville Policies.

In the Underlying Lawsuit, the True Blue HOA alleged that Beazer Homes Corp. improperly developed and constructed the buildings at True Blue Resort.  Specifically, the plaintiffs have alleged that the buildings have been constructed contrary to applicable building codes, good workmanship practices and manufacturer specifications, some of which resulted in water intrusion and other damages to non-defective components of the buildings.  The Court has found that the facts developed in the Underlying Lawsuit showed that some, but not all, of the damages to the buildings were to otherwise properly constructed component parts that were damaged as a result of water intrusion that was caused by negligent or inadequate construction. Although both parties presented expert testimony as to the amount of damages that constituted "water intrusion damages" and the amount that constituted other, non-covered damages, this Court finds that the greater weight of the evidence presented indicates that the total amount of the resulting damage was $525,294.

Under South Carolina law, "coverage is triggered at the time of an injury-in-fact and continuously thereafter to allow coverage under all policies in effect from the time of injury-in-fact during the progressive damage."  *Joe Harden Builders, Inc. v. Aetna Cas. & Sur. Co.*, 326 S.C. 231, 236, 486 S.E.2d 89, 91 (1997).  As the *Joe Harden* Court emphasized, the injury-in-fact date is different and distinct from the date of the injury-causing event.  The language in a commercial general liability requires that some damage occur during the policy period prior to having coverage triggered under that policy period.  *Id.* at 234, 486 S.E.2d at 90.  Accordingly, in

adopting the injury-in-fact date as the initial trigger for coverage, the *Joe Harden* Court explained:

> Under this theory [coverage triggered at the time of an injury-in-fact], coverage is triggered whenever the damage can be shown in fact to have first occurred, even if it is before the damage became apparent…

*Id.* at 236, 486 S.E.2d at 91.  See also, *Crossmann*, 395 S.C. at 55, 717 S.E.2d at 597 (explaining the holding in *Joe Harden* as "rather than defining the damage period as beginning with the injury-causing event and ending with manifestation, we defined the damage period as the term during which the actual injuries occurred.")

In the present case, the seventy-seven (77) buildings at issue at the True Blue Golf & Racquet Resort were constructed between 1997 and 2005.  Expert testimony was presented regarding the date on which the injury-in-fact, i.e. the date on which the otherwise non-defective component parts of the buildings were damaged by water intrusion, occurred for the buildings constructed at the True Blue Resort.

Upon consideration of the evidence, this Court has determined that based on the greater weight of the evidence, the injury-in-fact to the non-defective component parts of the buildings occurred approximately thirty (30) days after the date on which the certificates of occupancy were issued for each building.  Water started to seep into the interior envelopes of the buildings with the first rainfall after the buildings were completed.  Although no evidence was presented regarding the actual dates of the first rainfall after each building was completed, the lawyers appeared to concede in their closing argument before the Court that such rainfall would probably have occurred within the first thirty days after the certificates of occupancy were issued.  In accord, *Crossmann*, 395 S.C. at 65, 717 S.E.2d at 602 (parties stipulated that the damage resulting from water intrusion began within thirty days after the certificate of occupancy was

issued for each building).

This Court further finds that the water intrusion damage found in the buildings constructed at the True Blue Resort was progressive in nature. As the expert witnesses testified, damage caused by water seeping into the interior building envelope would have gotten worse with each rainfall. These experts also testified that the water damage would not have stopped progressing until the faulty construction causing the water to seep within the building was fixed. The Court finds from the credible evidence that the damages at the True Blue Resort were not fixed until the Underlying Lawsuit was settled. Accordingly, this Court has found that the progressive water intrusion damages continued from the date of the injury-in-fact (found to be thirty days after the certificate of occupancy was issued) until the date on which Beazer Homes paid the amount to settle the case. The testimony and documents presented at trial indicates that the date on which Beazer Homes transmitted the settlement check to the plaintiffs in the Underlying Lawsuit was January 17, 2013.

In *Crossmann*, the South Carolina Supreme Court definitively found that losses in a progressive damages case should be allocated among all triggered insurance policies based on each carrier's time-on-the-risk. *Id.* at 45, 717 S.E.2d at 591. The *Crossmann* Court also provided a framework as to how to calculate a triggered insurer's time-on-risk. Specifically, the *Crossmann* Court established the following "default rule:"

> In cases where it is impossible to know the exact measure of damages attributable to the injury that triggered each policy, courts have looked to the total loss incurred as a result of all of the property damage and then devised a formula to divide that loss in a manner that reasonably approximates the loss attributable to each policy period. The basic formula consists of a numerator representing the number of years an insurer provided coverage and a denominator representing the total number of years during which the damage progressed. This fraction is multiplied by the total amount the policyholder has become liable to pay as damages for the entire progressive injury. In this way, each triggered

34

insurer is responsible for a share of the total loss that is proportionate to its time on the risk.

*Id.* at 64-65, 717 S.E.2d at 602.

Applying the time-on-risk basic formula to the present case, this Court finds that only twelve buildings constructed at the True Blue Resort triggered coverage under the Harleysville Policies.  (See chart below.) Calculating the time during which Harleysville was on the risk according to the time that the damage occurred during its policy period compared to the total time that the damage progressed (from thirty days after the certificate of occupancy was issued until the date on which Beazer Homes paid the settlement amount) and multiplying that fraction by the amount of covered damages attributed to each building ($40,407)[7] this Court concludes that Harleysville's time-on-risk liability for the amount paid by Beazer Homes to settle covered damages is $16,473.34.

The following chart shows the Court's findings of the liability of Harleysville for its time on the risk, noting that the Harleysville policies were in effect from July 29, 1997 through August 29, 1998.

| Building | CO date Plus 30 days | Completion of damages date | Total days on risk | Harleysville days on risk | Covered damages per building | Harleysville Pro rata share* |
|---|---|---|---|---|---|---|
| 7 | 8/30/1997 | 1/17/2013 | 5619 | 364 | $40,407 | $2617.57 |
| 6 | 9/6/1997 | 1/17/2013 | 5612 | 357 | $40,407 | $2570.43 |
| 2 | 9/13/1997 | 1/17/2013 | 5605 | 350 | $40,407 | $2523.18 |
| 4 | 10/4/1997 | 1/17/2013 | 5584 | 329 | $40,407 | $2380.71 |
| 5 | 10/25/1997 | 1/17/2013 | 5563 | 308 | $40,407 | $2237.17 |
| 3 | 11/6/1997 | 1/17/2013 | 5551 | 296 | $40,407 | $2154.65 |
| 1 | 12/25/1997 | 1/17/2013 | 5502 | 247 | $40,407 | $1813.98 |
| 10 | 6/4/1998 | 1/17/2013 | 5341 | 86 | $40,407 | $ 650.63 |
| 9 | 6/4/1998 | 1/17/2013 | 5341 | 86 | $40,407 | $ 650.63 |
| 11 | 6/11/1998 | 1/17/2013 | 5334 | 79 | $40,407 | $ 598.45 |
| 8 | 6/28/1998 | 1/17/2013 | 5317 | 62 | $40,407 | $ 471.17 |
| 12 | 7/17/1998 | 1/17/2013 | 5298 | 43 | $40,407 | $ 327.95 |
| 13 | 9/2/1998 | 1/17/2013 | 5251 | 0 | $40,407 | $0.00 |

---

[7] *See* Finding of Fact 64 above.

TOTAL:                                                    $16,473.34

*Harleysville days on risk divided by total days on risk multiplied by $40,407.

Judgment in the amount of $16,473 is hereby entered in favor of Plaintiffs against Harleysville on their claim for indemnity for the payment made to settle the Underlying Lawsuit.

C.    Beazer Homes Is Entitled To Receive Its Reasonable, Necessary and Related Defense Costs Incurred In The Underlying Lawsuit.

This Court previously found that, because the Underlying Lawsuit triggered coverage under the Harleysville Policies, Harleysville had a duty to defend the entirety of all claims alleged against Beazer Homes Corp. in the Underlying Lawsuit. [See, Order dated 3/27/2013 (EN 248)]  The remedy to an insured for an insurer's breach of its duty to defend is payment of the expenses incurred by the insured in providing for its own defense.  *Unisun Ins. Co. v. Hertz Rental Corp.*, 312 S.C. 549, 554, 436 S.E.2d 182, 186 (S.C. App. 1993); *Hegler v. Gulf Ins. Co.*, 270 S.C. 548, 243 S.E.2d 443, 444 (1987)["If (insurer) had refused initially to defend, it would undoubtedly have been liable for the payment of counsel fees incurred by (insured) in the defense of the damage action."] As part of its proof on the damages for breach of contract for refusing to provide a complete defense in the underlying action, the insured must show that the requested fees and costs were reasonable, necessary and incurred in the defense of the underlying lawsuit.  *See Gordon-Gallup Realtors, Inc. v. Cincinnati Ins. Co.*, 274 S.C. 468, 265 S.E.2d 38 (1980); *Employers Mut. Liab. Ins. Co. v. Hendrix*, 199 F.2d 53, 58 (4th Cir. 1952).  See also, *Fabri v. The Hartford*, 69 Fed. Appx. 187, 192-93 (4th Cir. 2003) (jury verdict finding amount of reasonable attorney's fees in underlying action where insurer refused to provide a defense).

South Carolina courts have employed a six factor test when making a determination as to the reasonableness of attorneys' fees in completed litigation.  Those factors are as follows:

36

> the nature, extent, and difficulty of the legal services rendered**;**
>
> time and labor devoted to the case;
>
> professional standing of counsel;
>
> contingency of compensation;
>
> fee customarily charged in the locality for similar services; and
>
> beneficial results obtained.

*Hardaway Concrete Co. v. Hall Contracting Corp.*, 374 S.C. 216, 647 S.E.2d 488 (S.C. App. 2007).  Each factor is to be given due consideration.  *Id.*  The Court notes that this case presents a different issue for the Court than the issue in *Hardaway*.  In that case, the Court addressed the issue of the appropriate attorneys' fees award for a plaintiff that prevailed in litigation where one of the statutory remedies available to a successful litigant is an award of attorneys' fees. *Hardaway, supra*, 647 S.E.2d at 494-5.  In this case, the attorneys' fees and costs sought by Beazer to enforce Harleysville's duty to defend are breach of contract damages, and the basic premise for breach of contract damages is to place the non-breaching party in the same position as if there had been no breach.  *See, e.g., King v. Oxford*,  282 S.C. 307, 315-316, 318 S.E.2d 125, 130 (S.C. App. 1984); 1 Insurance Claims and Disputes Section 4:35 (6th ed.) ("The best rule, however, is simply to apply the standard ordinarily used for proving contractual damages. An award of attorneys' fees resulting from a breach of a duty to defend represents the insured's damages resulting from the carrier's breach of contract.  It should not be confused with those cases in which a trial court is authorized to award the prevailing party in litigation before the court reasonable attorneys' fees.")

To that extent, the six factors in the *Hardaway Concrete* case would impose a heavier burden on Beazer than is warranted in this case.  In any event, the Court finds the *Hardaway*

*Concrete* factors instructive. *See also, NGM Insurance Company v. Carolina's Power Wash & Painting, LLC*, 2010 WL 3258134 (D.S.C. July 6, 2010).

In federal court, the amount of an attorney's fee award is ordinarily governed by Local Rule 54.02. Under the "lodestar" formula, the Court multiplies the number of hours reasonably expended by counsel by a reasonable hourly rate. *See Child Evangelism Fellowship of South Carolina*, 2007 WL 1302692 (D.S.C. 2007). In determining reasonableness, the Court analyzes the twelve factors set forth in *Barber v. Kimbrell's, Inc.*, 577 F.2d 216 (4th Cir. 1978). Those twelve factors are "(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases." [8]

Beazer's Defense Costs Were Reasonable and Necessary.

Beazer's claims against Harleysville under its "duty to defend" are governed by the Court's March 27, 2013 Order [Entry Number 248], and the cases cited therein. Harleysville

---

[8] "[D]etermination of the hourly rate will generally be the critical inquiry in setting the reasonable fee, and the burden rests with the fee applicant to establish the reasonableness of a requested rate. *In addition to the attorney's own affidavits, the fee applicant must produce satisfactory specific evidence of the prevailing market rates in the relevant community for the type of work for which he seeks an award*. Although the determination of a market rate in the legal profession is inherently problematic, as wide variations in skill and reputation render the usual laws of supply and demand largely inapplicable, the Court has nonetheless emphasized that market rate should guide the fee inquiry. (internal citations omitted) Thus, '[t]he market rate should be determined by evidence of what attorneys earn from paying clients for similar services in similar circumstances, which, of course, may include evidence of what the plaintiff's attorney actually charged his client.'" *Robinson v. Equifax Information Services, LLC*, 560 F.3d 235, 244 (4th Cir. 2009), citing *Plyler v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990) and *Depaoli v. Vacation Sales Assocs., L.L.C.*, 489 F.3d 615, 622 (4th Cir. 2007).

breached its duty to defend Beazer against all claims in the *True Blue Lawsuit*, and the Court in March 2013 ordered Harleysville to reimburse Beazer for the reasonable attorneys' fees and other costs incurred to defend Beazer in the *True Blue Lawsuit*.

A number of factors support the Court's finding that Beazer's defense costs were reasonable and necessary. First, the *True Blue Lawsuit* was complex, and posed challenges (a) in document discovery, (b) with a large number (approximately 50) of different parties to the case, and (c) in the way of a large financial exposure to Beazer. All of these factors support Beazer's contention that a rigorous defense effort was required. Second, every invoice from a law firm, expert witness, consulting firm, or other company (*e.g.*, court reporters) that assisted Beazer in defense of the *True Blue Lawsuit* was reviewed first by Beazer's third party administrator (TPA), Helmsman Claims Management, which would flag any charges on the bills that were potentially inconsistent with Beazer's guidelines or otherwise worthy of further discussion. Those issues were then addressed by the TPA with the individual law firm or other service provider.

After the monthly review of invoices by the TPA and after the TPA addressed any out-of-the-ordinary charges on the invoices, Beazer's National Claims Manager, Mr. William Fisher, would also review the invoices to ensure that the charges were appropriate for payment. Mr. Fisher has spent more than 30 years working in the insurance industry. The first sixteen years of Mr. Fisher's career were spent as a claims manager for Chubb and later Royal insurance companies. In those positions, Mr. Fisher reviewed, processed, and authorized for payment numerous legal bills and other defense costs incurred to defend policyholders of Chubb and Royal, and is very experienced in this area.

Beazer had strong economic incentives to pay only those attorneys' fees and defense costs that were reasonable and necessary to defend the *True Blue Lawsuit*. While Helmsman (the

TPA) and Mr. Fisher (the National Claims Manager) were reviewing the invoices for appropriateness, Beazer had no way of knowing if Harleysville or any other insurer would reimburse any portion of the defense costs for the *True Blue Lawsuit*.  As Mr. Fisher testified, Beazer had only one way it managed the defense of the third-party lawsuits – managing the defense costs closely because those costs were paid with Beazer's money.

At trial Harleysville argued that Beazer spent money wastefully to defend the *True Blue Lawsuit*, perhaps because Beazer thought that Harleysville or some other insurer would eventually pay the defense costs.  By way of example, Harleysville criticized the costs incurred to depose the HOA's expert, Mr. Hodgin, for seventeen days over the course of the *True Blue Lawsuit*.  This contention was discredited at trial by, among other things, the testimony of Mr. Luther McCutchen, counsel for the HOA, who testified that as discovery in the *True Blue Lawsuit* progressed during the 2009-2012 time period, leading up to the November 2012 mediation and December 2012 trial date, Mr. Hodgin continued to supplement his prior expert reports and identified new issues with the True Blue Project.  Each time a new report came out and new issues were identified, it became necessary for Beazer to depose Mr. Hodgin again. Testimony from Mr. Fisher also revealed that Beazer and Helmsman closely monitored this situation to ensure that the costs associated with Mr. Hodgin's deposition were necessary and reasonable.  Finally, the Court finds that attorney Stephen Brown reported to Harleysville regarding the deposition of Mr. Hodgin, and Harleysville was fully aware that Mr. Hodgin was deposed over the course of a number of days, and Harleysville did not advise Beazer to limit the time spent deposing Mr. Hodgin or alter its deposition strategy in any way.  Accordingly, the Court rejects Harleysville's argument that Beazer spent money wastefully in the defense of the *True Blue Lawsuit*.

40

At trial Harleysville also argued that the costs Beazer incurred to defend the *True Blue Lawsuit* associated with work performed by the Bellamy Law Firm were not reasonable or necessary. As discovery progressed in the *True Blue Lawsuit*, and as Beazer's analysis of the voluminous records progressed, Beazer identified additional subcontractors against which to pursue third-party claims. Due to several conflicts of interest, Elmore Goldsmith could not bring third-party claims against four of the nearly 50 subcontractors that were eventually joined as parties to the *True Blue Lawsuit*, and the Bellamy Law Firm was engaged for that limited purpose. The Court finds that when those limited number of conflicts were discovered after substantial discovery, investigation, and other work in the case, the most efficient and reasonable course of action was for Beazer to identify another firm to pursue claims against those four subcontractors with which the Elmore Goldsmith firm had a conflict, rather than having Elmore Goldsmith withdraw from the case and substituting another firm to represent Beazer with respect to all claims. Further, the Court notes that the Bellamy Law Firm charged the same hourly rates charged by the attorneys at Elmore Goldsmith, and that there was no evidence presented at trial that tasks performed by the Bellamy Law Firm were unnecessary or duplicative of tasks performed by Elmore Goldsmith. Based on the evidence presented at trial, the Court rejects Harleysville's argument that the cost to defend the *True Blue Lawsuit* associated with work performed by the Bellamy Firm was unreasonable or unnecessary.

As discussed above, Beazer incurred significant costs related to the *True Blue Lawsuit* that were necessary and reasonable but that Beazer does not seek from Harleysville in this action. Beazer only billed one-third of the cost of the document review and coding to the *True Blue Lawsuit*, even though much more than one-third of the documents dealt with True Blue. In addition, Beazer paid substantial sums to the Elmore Goldsmith firm and to Mr. Moore before

41

the *True Blue Lawsuit* was filed.  Beazer retained a contract attorney and a contract paralegal at its own expense to review documents related to the True Blue Project and the *True Blue Lawsuit*. These tasks paid for by Beazer underscore the reasonableness of the defense costs Beazer seeks from Harleysville.

The facts also suggest that Harleysville tacitly acquiesced in Beazer's defense strategy for the *True Blue Lawsuit*.  Harleysville was aware of all aspects of Beazer's defense of the *True Blue Lawsuit* by virtue of status reports and numerous communications between officials at Harleysville and Harleysville-retained counsel Mr. Stephen Brown regarding the progress of the *True Blue Lawsuit*.  Notwithstanding this knowledge, Harleysville did not request to manage the defense of the *True Blue Lawsuit* -- as was its right under the Harleysville Policy so long as it agreed to defend Beazer against all claims – nor did Harleysville advise Beazer as to the manner by which Harleysville believed the *True Blue Lawsuit* should be defended.  As such, it is reasonable to assume that Harleysville was content that if it was later determined that Harleysville had a duty to defend Beazer, that the costs Beazer was incurring were reasonable and necessary.  At no point during 2009-2012 did Harleysville ever advise Beazer to retain fewer experts, limit the number of depositions, obtain prior approval for travel, file fewer motions, or alter in any way the manner in which Beazer was defending itself in the *True Blue Lawsuit*.

Because Harleysville chose not to provide any guidance to Beazer as to how best to defend the *True Blue Lawsuit*, Beazer was entitled to broad discretion to structure its defense effort in the *True Blue Lawsuit* in the manner it saw fit, and the Court will not allow Harleysville to "second guess" Beazer's defense strategy.  *See, also, Taco Bell Corp. v. Continental Cas. Co.*, 388 F.3d 1069, 1075-1076 (7th Cir. 2004) ("Because of the resulting uncertainty about reimbursement, [the policyholder] had an incentive to minimize its legal expenses (for it might

not be able to shift them); and where there are market incentives to economize, there is no occasion for a painstaking judicial review."); *Emhart Industries, Inc. v. Home Ins. Co.*, 515 F. Supp. 2d 228, 252 (D.R.I. 2007) ("An insurer's ability to contest this proffer, however, is somewhat diminished (although not entirely eradicated) [after breaching its duty to defend].  For example, second guessing an insured's tactical decisions within the defensive sphere is generally precluded, and uncertainties in the nature and extent of an insured's legal representation are to be resolved against the breaching insurer.  These nuances recognize that, by breaching its duty to defend, the insurer effectively ceded its 'right and duty' to control the manner and scope of the defense.").  The time for an insurance company to influence the manner in which potentially insured litigation is defended is at the beginning of the underlying lawsuit, not when the underlying litigation is concluded.

Finally, the Court concludes that Beazer's lead counsel, Mr. Elmore, is an experienced construction law litigator with a reputation as a litigator in South Carolina construction law, and his selection by Beazer to be lead counsel was reasonable.  Further, the Court finds that the rate structure for Mr. Elmore's firm was reasonable.  Finally, Beazer and its defense team obtained an excellent result in the *True Blue Lawsuit*, settling the case for a net payment by Beazer to the True Blue HOA that was a fraction of the $12-$16 million exposure that Harleysville's retained counsel, Stephen Brown, estimated for Harleysville.  For all of these reasons, the Court concludes that the unreimbursed attorneys' fees and other costs incurred by Beazer to defend the *True Blue Lawsuit* -- $2,493,131 – were reasonable and necessary. [9]  The Court will deduct,

---

[9] Excluding certain fees incurred before the *True Blue Lawsuit* was filed and certain minor billing irregularities, the Court finds that the total cost to defend the *True Blue Lawsuit* is $2,572,522.05.  [PX-226.]  Beazer recovered $79,390.51 in defense costs through the payment of defense costs by an insurer other than Harleysville while the *True Blue Lawsuit* was active; therefore, Beazer's net unreimbursed cost to defend the *True Blue Lawsuit* is $2,493,131.54.

however, one-half (½) of the attorney's fees of attorney Stephen Brown ($92,359)[10] and will also deduct the costs paid by Harleysville ($37,394) because Harleysville did, by paying Mr. Brown and paying these costs, contribute to some extent to Beazer's defense.  The Court is reducing the attorney fee award only by one-half of Brown's attorney's fees because some of the work would have been duplicative with the work of Elmore's firm.  The Court will next discuss whether Harleysville is entitled to a credit against the amount it owes Beazer for amounts paid to Beazer by other carriers.

D.    Beazer Homes Is Entitled To Payment From Harleysville For Those Reasonable Defense Costs Not Previously Reimbursed By Other Insurance Carriers.

Beazer Homes entered into settlement agreements with six insurance carriers from which it sought coverage and a defense for the Underlying Lawsuit.[11]  The language in the settlement agreements is clear that in exchange for the payments made, Beazer Homes agreed to release all claims for coverage under the insurer's policies.  As Beazer Homes claimed both defense and indemnity under the policies at issue and the settlement agreements contained general releases, without allocation of an amount toward defense costs or an amount toward indemnity, the Court concludes that the settlement amounts paid by these carriers included payment for both.

To allow Beazer to recover a second time from Harleysville for defense costs for which it has already been reimbursed would allow Beazer to obtain a legally impermissible windfall and

---

[10] The Court found in Finding of Fact # 31 that Harleysville paid the Young Clement Rivers firm $184,719 in attorney's fees and $6091 in expenses and that, including the other expenses paid by Harleysville such as court reporter fees, Harleysville paid a total of $222,113 in defense of the underlying lawsuit.

[11] On August 13, 2013, the parties filed a Joint Motion to Seal (ECF No. 56).  In this motion, they requested the Court to seal Defendant's Exhibits 82, 77, and 79, which were confidential settlements with other carriers.  The grounds for the motion were that the agreements contain confidential information and that Beazer promised in the agreements not to disclose the contents of the agreements absent a court order or written consent of the parties to the agreement. The Court reviewed the Joint Motion and heard from counsel and issued a Temporary order sealing the exhibits on August 15, 2013.  The order set a deadline of August 23, 2013 for any interested party to object to the permanent sealing of the exhibits.  That deadline has now passed, and no such filing has been made.  The Court has considered less drastic alternatives to sealing the requested exhibits and finds that less drastic alternatives are not appropriate in this case, as the exhibits concern confidential settlements between Beazer and insurance companies which are not parties to the present action.  The Court finds persuasive the arguments of counsel in favor of sealing the exhibits and rejecting the alternatives.  Therefore, the Court grants the [345] Joint Motion to Seal.

double recovery.  See, 15 Couch on Insurance (3rd ed. 1999) § 217:1, pp. 217-5 to 217-6 ("as a general rule, the fact that the insured has double coverage does not mean that he or she is entitled to recover twice for the same loss").

South Carolina law provides that set-off or credit arises out of the inherent equitable jurisdiction of the court and commits to the Court's discretion the issue of whether equitable considerations bar set-off claimed by a non-settling defendant.  *Welch v. Epstein*, 342 S.C. 279, 313, 536 S.E.2d 408,425 (2000). *See also, W.M. Kirkland, Inc. v. Providence Washington Insurance* Co., 264 S.C. 573, 216 S.E.2d 518 (1975); *Rutland v. South Carolina Dept. of Transportation*, 400 S.C. 209, 734 S.E.2d 142, 145 (2012)("The trial court's jurisdiction to set off one judgment against another is equitable in nature and should be exercised when necessary to provide justice between the parties.")  Harleysville bears the burden of proving entitlement to any set-off remedy it seeks.  *See generally*, *Diamond Swimming Pool Co. v. Broome*, 252 S.C. 379, 386, 166 S.E.2d 308, 312 (1969).  The Court finds that Harleysville has met this burden.

Beazer Homes has argued that the amount that Beazer Homes has already received from other carriers to compensate it for its defense costs constitutes a collateral source and cannot be used to offset what Harleysville may owe to reimburse Beazer Homes for its reasonable attorneys' fees and defense costs.  Beazer asserts that, if an offset is allowed, it would not be made whole.  Specifically, Beazer contends that it paid the True Blue HOA $3,336,800 to settle the underlying action and incurred attorney's fees and costs of $2,572,522 to defend the True Blue lawsuit; and that it recovered payments from other sources in the amount of $2,986,000.  It further contends that all of the amounts received from other sources were internally allocated by Beazer to indemnity and not defense costs.  Therefore, Beazer contends that it still has $350,800 in unreimbursed indemnity costs for the settlement payment and unreimbursed defense costs of

$2,493,131 (after deduction of the $79,390 paid toward defense costs discussed above). However, Beazer Homes' argument is without merit.  The settlement payment by Beazer to True Blue HOA included both covered and non-covered damages.  Also, the fact that Beazer internally allocated the settlements received from other carriers to indemnity is not binding on this Court.

This Court's allowance of an offset for the amounts paid by other insurance carriers to reimburse Beazer Homes for its defense costs does not violate the collateral source rule.  Under the collateral source rule, a tortfeasor has no right to any mitigation of damages because of payments or compensation received by the injured person from a source wholly independent of the wrongdoer. *Johnston v. Aiken Auto Parts*, 311 S.C. 285, 428 S.E.2d 737 (S.C. App. 1993). The purpose of the collateral source rule is to prevent a tortfeasor from obtaining a windfall. *Dixon v. Besco Eng'g, Inc.,* 320 S.C. 174, 182, 463 S.E.2d 636, 640 (Ct. App. 1995).  A source is wholly independent of the wrongdoer "when the wrongdoer has not contributed to it and when payments to the injured party were not made on behalf of the wrongdoer." *Mount v. Sea Pines Co., Inc.*, 337 S.C. 355, 357, 523 S.E.2d 464, 465 (S.C. App. 1999) (citation omitted).

Application of the collateral source rule to exclude an offset for the amounts already received by Beazer to reimburse it for the defense costs it incurred in the Underlying Lawsuit would result in an unjust windfall and a double recovery for Beazer. While South Carolina has not addressed the issue, the clear majority of courts have rejected the application of the collateral source rule where more than one insurance policy or third party provides coverage for the same loss. See, e.g., *Pan Pacific Retail Props. v. Gulf Ins.*, 471 F.3d 961, 973–74 (9th Cir.2006) (applying California law); *Safeco Ins. Co. of Am. v. City of White House, Tenn.*, 191 F.3d 675, 693 (6th Cir.1999) (applying Tennessee law); *Asher v. Unarco Material Handling, Inc.*, 862 F.

Supp.2d 551 (E.D.Ky. 2012) (applying Kentucky law); *Garofalo v. Empire Blue Cross & Blue Shield*, 67 F. Supp.2d 343, 347 (S.D.N.Y.1999) (applying New York law); *Centon Elecs., Inc. v. Bonar*, 614 So.2d 999, 1004 (Ala.1993); *Grover v. Ratliff*, 120 Ariz. 368, 586 P.2d 213, 215 (Ariz. Ct. App.1978); *City of Miami Beach v. Carner*, 579 So.2d 248, 253–54 (Fla.DCA.1991); *Amalgamated Transit Union Local 1324 v. Roberts*, 263 Ga. 405, 434 S.E.2d 450, 452 (1993); *Midland Mut. Life Ins. Co. v. Mercy Clinics, Inc.*, 579 N.W.2d 823, 830 (Iowa 1998); *Corl v. Huron Castings, Inc.*, 450 Mich. 620, 544 N.W.2d 278, 286 (1996); *Cone Mills Corp. v. Allstate Ins. Co.*, 443 S.E.2d 357 (N.C. App. 1994).

This national consensus exists for good reason: the policies underlying the collateral source rule "are less compelling" in breach of contract cases than in tort actions. Restatement (Second) of Contracts § 347 cmt. e (1979). Tort law's focus on punishment and deterrence favors the risk of a plaintiff's double recovery over the risk of under-deterring the defendant. Unlike in tort law, the purpose of damages in contract law is not deterrence and punishment. "The purpose of an award of damages for breach of contract is to put the plaintiff in as good a position as he would have been in if the contract had been performed." *Minter v. GOCT, Inc.,* 322 S.C. 525, 528, 473 S.E.2d 67, 70 (Ct.App.1996).

Instead, contractual damages are almost purely compensatory, measured by the amount that the non-breaching party would have received if the contract had been performed as promised. *Branche Builders, Inc. v. Coggins*, 386 S.C. 43, 48, 686 S.E.2d 200, 202 (Ct. App. 2009); *see also*, 22 Am. Jur.2d Damages § 45 (limiting a party's recovery in a breach of contract action to "the loss that he has actually suffered by reason of the breach"). Applying the collateral source rule to contract law would "contravene this principle by awarding the non-breaching party

more damages than necessary to compensate it for the breach." *Midland Mut. Life Ins. Co. v. Mercy Clinics, Inc.*, 579 N.W.2d 823, 830 (Iowa 1998).

Beazer has argued that the decision in *Atkinson v. Orkin Exterminating Co.*, 361 S.C. 156, 604 S.E.2d 385 (2004) supports its contention that the collateral source rule bars this Court from offsetting any damages assessed against Harleysville for its reasonable defense costs in the Underlying Lawsuit with the amounts Beazer has already received from the other settling carriers. Beazer's argument is misplaced.

In *Atkinson*, the plaintiffs purchased a home on which Orkin had a termite bond. The plaintiffs requested Orkin to transfer the termite bond on the house to them as the new homeowners. Orkin refused the transfer in contravention of the explicit terms of the termite bond. Accordingly, the plaintiffs obtained a termite contract with Terminix. Thereafter, the plaintiffs discovered termites and termite damage in the structure of their home and brought a lawsuit against both Orkin and Terminix. Terminix settled with the plaintiffs and the case proceeded against Orkin for negligence and breach of contract accompanied by fraudulent act. Ultimately, the jury returned a verdict in favor of the plaintiffs as follows: $6,191 in compensatory damages and $786,500 in punitive damages resulting from the breach of contract accompanied by fraud and $69,068.33 for damages resulting from Orkin's negligence. The trial court allowed Orkin an offset for the amount of a settlement paid by Terminix for the damages resulting from the negligence claim because the court found that Terminix was a joint tortfeasor for those damages.

The Supreme Court overruled the set-off based on the collateral source rule:

> We find that the trial judge erred in treating Orkin and Terminix as joint-tortfeasors. The duties that Orkin and Terminix owed the Atkinsons were based upon independent, unrelated contracts, not a common duty of care. Moreover, we see no indication that the claims against Terminix

4:09-cv-01379-RBH    Date Filed 09/27/13    Entry Number 350    Page 49 of 54

> constituted a "contributing factor" to Orkin's negligent inspection of the
> house.  Accordingly, we hold that the proceeds from the Terminix
> settlement was a collateral source, and therefore the trial court erred in
> offsetting the judgment by the amount the Atkinsons received in
> settlement.

*Id.*, 604 S.E.2d at 394.  The court found that the "duty" under tort law, one of the elements of the negligence claim, arose from the plaintiffs' respective contract with both companies.  However, the *Atkinson* case does not support Beazer's position that the collateral source rule applies to determining damages for contractual claims.  To the contrary, it merely upholds the enforcement of the rule in tort cases.

The collateral source rule only applies to tort claims.  It has no bearing on the breach of contract claims which form the basis of the present action.  When a contract is breached, the non-breaching party is limited to recovering that amount that it would have received if the contract had not been breached.  In this case, Beazer is only entitled to recover once for the reasonable defense costs it incurred in the Underlying Lawsuit.  By seeking to have this Court bar any reduction from the amounts it has already received in defense costs from the settling insurers, Beazer would receive a windfall.  This Court will not allow such a windfall for Beazer  in this case.[12]  The Court finds that Harleysville has met its burden of showing that it is equitably entitled to a set-off.

---

[12]  Beazer moved the introduction into evidence at trial of Plaintiff's Exhibit 781, which was a letter from Mr. Martin McNerney, a trial attorney for Beazer in this DJ action, to Mssrs. David Brown and Robert Calamari, counsel for Harleysville in this action. The letter references an attached letter to attorney Stephen Brown requesting copies of e-mails referenced in his time records in the Underlying Action and an attached e-mail from Mr. Stephen Brown's assistant indicating that the firm does not have any record of the requested e-mails.  Plaintiff's Exhibit 781 requested that the e-mails be produced.  The time records are quoted in the letter and refer to "correspondence" (explained as most likely to be e-mails by attorney Stephen Brown in his deposition) as follows:  "Receive and Review correspondence from Brian Tormey (Harleysville employee) regarding his understanding of status of settlement", "Receive and review correspondence from Brian Tormey inquiring impact of settlement on our insured", and "correspondence to Brian Tormey addressing possible avenues for Beazer to pursue against us."  Harleysville objects to the admission of the exhibit on grounds of relevance.  The Court finds that the exhibit should be admitted into evidence regarding Beazer's argument that Harleysville is not equitably entitled to a set-off.  However, after reviewing all of the evidence, the Court is not convinced by Beazer's arguments.

Allowing Harleysville a set-off or credit for the amounts that Beazer previously received from other carriers for defense costs does not contravene *Sloan Construction Co. v. Central Nat. Ins. Co*., 269 S.C. 183, 236 S.E.2d 818 (1977).  In *Sloan*, the South Carolina Supreme Court held where two insurance carriers insure the identical risk, one insurance carrier may not seek contribution from the other for defense costs that the first insurance carrier paid to defend the insured in an underlying lawsuit.   Therefore, *Sloan* involved a contribution claim from one insurer against another insurer.  The present matter does not involve any claims for contribution (as those claims were previously dismissed by this Court).  Instead, the present action involves a claim by a policyholder, who has already received some recovery for defense costs from other insurers, and now seeks a duplicate recovery for those same costs from Harleysville.  The present issue, specifically whether any amount adjudged against Harleysville for reimbursement of reasonable defense costs should be reduced by the amounts previously received by Beazer Homes to compensate it for that same loss, was not addressed by the *Sloan* Court.  Although *Sloan* bars contribution from other carriers once payment has been made by one carrier for defense costs, it does not bar the application of off-sets for payments previously received by the insured from other carriers.  Accordingly, *Sloan* has no applicability to whether Harleysville is entitled to an off-set or reduction for amounts that Beazer Homes has already received in reimbursed defense costs from other carriers.

After review of the pertinent factors outlined above and the submissions of the parties, the Court concludes that an appropriate amount to award to Beazer Homes as a reasonable attorneys' fee in the Underlying Lawsuit is $1,087,998 [$2,493,131[13](amount of unreimbursed attorney's fees) minus $1,275,380[14] (credit for settlements with other carriers) minus

---

[13] *See* Finding of Fact 57.
[14] *See* Finding of Fact 57.

$129,753[15] (1/2 of Attorney Brown's attorney's fees plus all of the expenses paid by Harleysville).    The Court believes that an award of $1,087,998 is a fair award in compensation for the breach of contract and also considering the  South Carolina factors and the *Barber* factors.

### Prejudgment Interest

Beazer requests prejudgment interest on the attorney's fee award beginning on April 3, 2013, the date when it requested a specific amount.  However, the Court denies this request as the measure of recovery was not fixed at that time.  *See Babb v. Rothrock*, 426 S.E.2d 789, 791 (1993).

E.    Harleysville Owes Beazer Homes Its Attorneys' Fees In the Present Action.

Beazer also seeks an award of attorneys' fees and costs incurred in this action because Beazer was required to prosecute its third-party claim against Harleysville to enforce Harleysville's duty to defend.  Beazer's Third-Party Complaint against Harleysville asked the Court to "award Beazer its attorneys' fees in an amount sufficient to reimburse Beazer for costs resulting from Harleysville's breach of contract," and to "award Beazer its costs associated with this action."  [Beazer's Third-Party Complaint, ECF No. 27, at p. 16.]

Under well-settled South Carolina law, Beazer is entitled to recover its attorneys' fees and related costs incurred in this action because those attorneys' fees and related costs were incurred to force Harleysville to honor its duty to defend.  *Berenyi, Inc. v. Landmark Am. Ins. Co.*, 2010 WL 233861, *10 (D.S.C. 2010) ("The court finds that Berenyi [the policyholder plaintiff] is entitled to recover attorney fees incurred in bringing this action to establish Landmark's duty to defend."); *Security Ins. Co. of Hartford v. Campbell Schneider & Associates LLC*, 481 F. Supp. 2d 496 (D.S.C. 2007).

---

[15] *See* Finding of Fact 31.

Contrary to Harleysville's statement in closing argument, Beazer does not need to establish that Harleysville's refusal to provide a full defense to Beazer in the *True Blue Lawsuit* was made in bad faith in order for Beazer to recover attorneys' fees from Harleysville for this coverage action.  In *Campbell Schneider*, *supra*, Judge Duffy held as follows:

> Plaintiff's final argument is that the court should not award attorney's fees to Defendants because there is no evidence that Plaintiff acted unreasonably or in bad faith in defending the State Action pursuant to a reservation of rights and pursuing this declaratory judgment action.  Neither *Hegler* nor *First Financial Insurance Company* mentions bad faith, however.  While some states require a finding of bad faith before allowing an insured to recover attorney's fees for defending a declaratory judgment action brought by the insurer, South Carolina does not require such a finding.  Therefore, pursuant to *Hegler* and *First Financial Insurance Company*, Defendants are entitled to an award of reasonable attorney's fees.

*Campbell Schneider*, 481 F. Supp. 2d 496, 502 (D.S.C. 2007) (citing *Hegler v. Gulf Ins. Co.*, 270 S.C. 548, 243 S.E.2d 443 (1978); *First Financial Ins. Co. v. Sea Island Sport Fishing Soc'y, Inc.*, 327 S.C. 12, 490 S.E.2d 257 (1997)).  Judge Duffy similarly held in *Berenyi* that "under South Carolina law, an attorneys' fees award to a prevailing insured did not depend on a finding of the insurer's bad faith."  *Berenyi, Inc. v. Landmark Am. Ins. Co.*, 2010 WL 233861, *10 (D.S.C. 2010).  This Court has recognized the South Carolina insurance coverage law discussed above as applying to a policyholder's right to recover attorneys' fees in coverage litigation to enforce a primary insurer's duty to defend.  *Baiden and Associates, Inc. v. Crum & Forster Specialty Ins. Co.*, 2012 WL 591752 (D.S.C. Feb. 23, 2012) ("[T]he central question of whether attorney's fees are appropriate in these types of cases turns on whether the dispute involves 'a dispute with an insurer concerning the insurer's duty to defend,' not whether the declaratory judgment action was brought by the insurer or the insured.").

The fact that Harleysville offered Beazer a partial defense to claims related only to Buildings 1-13 does not defeat Beazer's right to attorneys' fees for this action. In *Security*

*Insurance Company of Hartford v. Campbell Schneider & Associates*, 481 F. Supp. 2d 496 (D.S.C. 2007) the insurer "began the defense [of the policyholder] and then sought, through the declaratory judgment action, to avoid any obligation to continue to defend."  *Id.* At 499. Because the policyholder was forced to litigate the question of the insurer's duty to defend, the Court concluded the policyholder was entitled to its defense costs.

> There is no material difference in the legal effect between an outright refusal to defend and in undertaking the defense under a reservation of right until a declaratory judgment is prosecuted to resolve the question of coverage.  In either event, an insured must employ counsel to defend in the first instance tin the damage action and in the second in the declaratory judgment action to force the insurer to provide the defense.  In both, the counsel fees are incurred because of the insurer's disclaimer of an obligation to defend.

*Id.* at 499.

The Court concludes that Beazer is entitled to recover its reasonable attorneys' fees and costs incurred in this action to enforce Harleysville's duty to defend.  The parties should attempt to resolve the issue as to the amount of those fees.  If they cannot resolve the issue within forty-five (45) days, then counsel should file a petition for attorney's fees pursuant to Local Rule 54.02 and addressing the appropriate factors, with affidavit of counsel and supporting documentation.[16]

## IV.  FINAL JUDGMENT

Therefore, for the reasons stated above, and based on the entire record, the Court enters judgment as follows:

    a.  judgment is entered in favor of Beazer and against Harleysville in the amount of $1,087,998, Beazer's costs to defend the *True Blue Lawsuit*;

    b.  judgment is entered in favor of Beazer and against Harleysville for Beazer's attorneys' fees and costs incurred in this action to enforce Harleysville's duty to defend, the amount of such fees and costs to be set on consideration of a petition for attorney's fees to be filed;

---

[16] The Court notes that this action did not just involve the dispute between Beazer and Harleysville.  It was initiated by Cincinnati and also involved several other carriers.  Therefore, any award of attorney's fees for this action should only include work performed in relation to the dispute between Beazer and Harleysville.

    c.   judgment is entered in favor of Beazer and against Harleysville in the amount of $16,473.34, which is Harleysville's time-on-risk indemnity obligation under the Policy; and

AND IT IS SO ORDERED.

Dated: September 27, 2013
Florence, South Carolina


                    s/R. Bryan Harwell
                    R. Bryan Harwell
                    United States District Judge