IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Crossmann Communities of North Carolina, Inc.; Crossmann Communities, Inc.,; Beazer Homes Investment Corp.; Beazer Homes Corp., Inc., | ) ) ) ) ) ) | Civil Action No. 4:09-1379-RBH  **O R D E R** |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| Harleysville Mutual Insurance Company, | ) ) ) | |
| Defendant. | ) ) | |

A bench trial was held in this case on August 12 through 13, 2013. On September 27, 2013, this Court issued its Findings of Fact and Conclusions of Law. Before the Court is Defendant's Motion for Judgment NOV, to Alter or Amend Judgment, to Amend/Make Additional Findings, and for New Trial pursuant to Fed. R. Civ. P. 50(b)[1], 52(b), 59, and 59(e), filed on October 25, 2013 (ECF # 353). Plaintiffs filed a response in opposition to the motion on November 12, 2013. Defendant filed a Reply on November 22, 2013. The Court denies the motion for Judgment NOV and for new trial, but makes some additional findings, amends the judgment as to Harleysville's time-on-risk indemnity obligation, and further explains its rulings on several grounds.

---

[1] "The motions described in Federal Rule 50 are available only in cases tried to a jury that has the power to return a binding verdict. Thus, it does not apply to cases tried without a jury or to those tried to the court with an advisory jury." 9B Arthur R. Miller, *Federal Practice and Procedure*, Section 2523 (2008).

1

**Legal Standard**

Fed. R. Civ. P. 52(b) provides that "[o]n a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings-or make additional findings-and may amend the judgment accordingly. The motion may accompany a motion for new trial under Rule 59."

Fed. R. Civ. P. 59(a)(1)(B) provides that the court may on motion grant a new trial on some or all of the issues "for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court." Rule 59(a)(2) allows the court after a nonjury trial to "open the judgment, if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment." Although Rule 59 addresses grounds for new trials, some courts have found that the concept of a new trial under Rule 59 is sufficiently broad to include a rehearing of any matter decided by the court without a jury. 11 Arthur R. Miller, Mary Kay Kane, Richard L. Marcus & Adam N. Steinman, *Federal Practice and Procedure* § 2804 (3d ed. 2013).

Fed. R. Civ. P. 59(e) provides that a motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment.

Motions under Rule 59 are not to be made lightly: "[R]econsideration of a previous order is an extraordinary remedy, to be used sparingly in the interests of finality and conservation of judicial resources." *Nelson v. Sam's Club*, No. 4:10–3020–RBH, 2011 WL 2559548 at *1 (D.S.C. June 28, 2012) (quoting 12 James Wm. Moore et al., *Moore's Federal Practice* ¶ 59.30[4] (3d ed.)); *see also Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co.*, 148 F.3d 396, 403 (4th Cir. 1998) ("In general, reconsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly.").

The Fourth Circuit has held that a Rule 59(e) motion should be granted for only three reasons: (1) to follow an intervening change in *controlling* law; (2) on account of new evidence; or (3) "to

2

correct a *clear error of law* or prevent manifest injustice." *Collison v. International Chemical Workers Union*, 34 F.3d 233, 235 (4th Cir. 1994) (emphasis added).  Further, "a new trial will not be granted on grounds not called to the court's attention during the trial unless the error was so fundamental that gross injustice would result."  *United States v. Timms*, No. 12-8157, 2013 WL 4034501 at * 1 (4th Cir. August 9, 2013), citing *United States v. Carolina E. Chem. Co., Inc*., 639 F.Supp. 1420 (D.S.C. 1986)(citing Wright and Miller, *Federal Practice and Procedure*, § 2805).  A motion under Rule 59 is not an opportunity to rehash issues already ruled upon because a litigant is displeased with the result. *See Tran v. Tran*, 166 F. Supp. 2d 793, 798 (S.D.N.Y. 2001).

**Discussion**

The motion before the Court has eighteen grounds, most of which have already been addressed in the Court's previous summary judgment orders (ECF No. 248 and 249) or in the Findings of Fact and Conclusions of Law (ECF No. 350).  However, the Court will discuss in this Order the following grounds presented in the defendant's motion: Ground Nine (9) pertaining to the amount of Harleysville's indemnity obligation; Grounds Eleven (11) and Twelve (12) pertaining to the award of attorney's fees for the underlying action; and Ground Sixteen (16) regarding the Court's allocation of the portion of the settlements from other insurers that constituted reimbursement of defense costs.

In Ground Nine of the motion, Harleysville asserts that the Court incorrectly determined the amount of covered damages per building when it calculated Harleysville's time-on-risk liability. Beazer does not respond to this argument other than to say that trial courts may alter the default "time-on-risk" default formula set forth in *Crossmann Communities of North Carolina, Inc. v. Harleysville Mutual Insurance Company*, 395 S.C. 40, 717 S.E.2d 589, 602 (2011)  where "a strict application would be unduly burdensome or otherwise inappropriate under the circumstances of a particular case."

3

>    Harleysville asserts:
>
>    In calculating the amount of covered damages, this Court relied on the testimony from Richard Moore and Sidney Mathis and concluded that the total cost to repair the resulting damages at Buildings 1 through 13 (the buildings whose certificates of occupancy were issued during the effective period of coverage of the Harleysville Policies) was $525,294. The Court then used this amount as the covered damages when determining Harleysville's time-on-risk liability. In doing so, this Court failed to appropriately determine what portion of the actual settlement paid by Beazer ($3,336,800) was attributable to settling claims for covered damage at Buildings 1 through 13.

(ECF No. 353-1, p. 20)

Harleysville further points out that both experts based their calculations on the total indemnity exposure in the underlying lawsuit of over $20 million and that their work on the case was performed before the settlement occurred. It further asserts that in order to determine what portion of the settlement was paid to settle only covered damages in Buildings 1 through 13, it was necessary for this Court to determine what percentage of the total damages at Buildings 1 through 13 consisted of covered damages. Defendant suggests that one method of determining this amount would be to compare the amount that the Court found to represent the cost to repair covered damages ($525,294) to the evidence presented of the amount that would be required to repair all damages at Buildings 1 through 13. Evidence indicated that it would cost some $3,000,000[2] to repair all damages at these buildings. (*See* Def. Exh. 41). The amount that this Court found it would cost to repair covered damages is 17.5% of this total ($525,294 divided by $3 million). This percentage would then be applied to the amount paid by Beazer to settle all claims.

---

[2] The number reflected in Defendant's Exhibit 41 for total damages at Buildings 1 through 13 was $3,328,292.73. Beazer has not made a detailed response to Harleysville's motion as to this argument. The Court notes that using $3,000,000 (as suggested by Harleysville) rather than $3,328,292.73 in the calculation results in a higher indemnity amount, which benefits Beazer.

4

The Court would therefore divide the total settlement paid by Beazer ($3,336,800) by the number of buildings (77) to determine an amount paid to settle all damages per building. The Court agrees with the defendant's argument and amends its findings. The Court finds that Beazer paid $43,335.10 to settle all claims (both covered and non-covered) per building. Applying the percentage of covered damages (17.5%) to this amount, results in a finding that for each building, Beazer paid $7,584 to settle claims of covered damages. The chart below summarizes the Court's amended findings.

| Building | CO date Plus 30 days | Completion of damages date | Total days on risk | Harleysville days on risk | Covered damages per building | Harleysville Pro rata share* |
|---|---|---|---|---|---|---|
| 7 | 8/30/1997 | 1/17/2013 | 5619 | 364 | $7,584 | $491 |
| 6 | 9/6/1997 | 1/17/2013 | 5612 | 357 | $7,584 | $482 |
| 2 | 9/13/1997 | 1/17/2013 | 5605 | 350 | $7,584 | $474 |
| 4 | 10/4/1997 | 1/17/2013 | 5584 | 329 | $7,584 | $447 |
| 5 | 10/25/1997 | 1/17/2013 | 5563 | 308 | $7,584 | $420 |
| 3 | 11/6/1997 | 1/17/2013 | 5551 | 296 | $7,584 | $404 |
| 1 | 12/25/1997 | 1/17/2013 | 5502 | 247 | $7,584 | $340 |
| 10 | 6/4/1998 | 1/17/2013 | 5341 | 86 | $7,584 | $122 |
| 9 | 6/4/1998 | 1/17/2013 | 5341 | 86 | $7,584 | $122 |
| 11 | 6/11/1998 | 1/17/2013 | 5334 | 79 | $7,584 | $112 |
| 8 | 6/28/1998 | 1/17/2013 | 5317 | 62 | $7,584 | $ 88 |
| 12 | 7/17/1998 | 1/17/2013 | 5298 | 43 | $7,584 | $ 62 |
| 13 | 9/2/1998 | 1/17/2013 | 5251 | 0 | $7,584 | $  0 |
| TOTAL: | | | | | | $3,565 |

Based on the above, the Court amends its Findings of Fact and Conclusions of Law to find that Harleysville's liability for its time on the risk indemnity is $3,565.

The Court will next discuss the attorneys' fee award for the underlying action (Grounds Eleven and Twelve). Harleysville first asserts that the Court failed to utilize the correct standard when determining the amount of reasonable, necessary and related defense costs in the underlying lawsuit. Specifically, Harleysville contends that the Court erred in finding that application of the

5

six factors in *Hardaway Concrete Co. v. Hall Contracting Corp.*, 374 S.C. 216, 647 S.E. 2d 488 (S.C. App. 2007) would impose a heavier burden on Beazer than is warranted in this case. The Court reiterates its finding that the attorney's fees and costs sought by Beazer to enforce Harleysville's duty to defend are "breach of contract" damages and that this is a situation distinct from cases in which a court awards attorney's fees to a prevailing party in litigation before the court.[3] Regardless, however, the Court did consider and apply the factors used by South Carolina and federal courts in its Findings of Fact and Conclusions of Law. To the extent that each of the factors may not have been addressed in sufficient detail by this Court previously, the Court will further elaborate on the factors in this Order and make additional findings.

South Carolina courts have employed a six factor test when making a determination as to the reasonableness of attorneys' fees in completed litigation. Those factors are as follows: (1) the nature, extent, and difficulty of the legal services rendered; (2) time and labor devoted to the case; (3) professional standing of counsel; (4) contingency of compensation; (5) fee customarily charged in the locality for similar services; and (6) beneficial results obtained. *Id.*, 647 S.E. 2d at 494-5.

With regard to the first factor (the nature, extent, and difficulty of the legal services rendered) this Court has already found that, with regard to the underlying construction lawsuit involving numerous buildings, "the *True Blue Lawsuit* was complex, and posed challenges (a) in

---

[3] Defendant cites *Noisette v. Ismail*, 299 S.C. 243, 384 S.E.2d 310 (Ct. App. 1989), overruled on other grounds, 304 S.C. 56, 403 S.E.2d 122 (S.C. 1991), in support of its argument that the six *Hardaway* factors should be applied in a breach of contract action. In *Noisette*, no proof was offered at trial of the time the attorney spent in defending the underlying action. The court vacated and remanded the attorney's fee award on the basis that the record did not reflect "the nature and extent of the services rendered . . . , the complexity of the issues involved with the case, and the beneficial results obtained." 384 S.E. 2d at 317. In the case at bar, this Court considered each of the cited factors as well as the other *Hardaway* factors not mentioned in *Noisette*.

6

document discovery, (b) with a large number (approximately 50) of different parties to the case, and (c)in the way of a large financial exposure to Beazer." (ECF No. 350, p, 39)

The second factor (time and labor devoted to the case) was also previously addressed. The Court found that "[e]xcluding certain fees incurred before the *True Blue Lawsuit* was filed and certain minor billing irregularities, the Court finds that the total cost to defend the *True Blue Lawsuit* is $2,572,522.05. [PX-226.] Beazer recovered $79,390.51 in defense costs through the payment of defense costs by an insurer other than Harleysville while the True Blue Lawsuit was active; therefore, Beazer's net unreimbursed cost to defend the *True Blue Lawsuit* is $2,493,131.54." (ECF No. 350, p. 43, note 9) This total includes fees and costs. Elmore testified in his deposition which was introduced into evidence at trial that the total amount of the fees charged by his law firm was approximately $1,745,000. (Depo. p. 26). Elmore further described the labor required. Plaintiffs submitted several volumes of evidence regarding time and labor (its fees and costs), including their detailed billing records from June of 2009 through February of 2013. The Court has reviewed the voluminous invoices presented and notes the extensive amount of time that was spent by counsel for Beazer in defending the state court case. A review of the invoices indicates that Elmore's billed time as senior partner was 1875 hours; other partners billed 1138 hours; associates billed 1785 hours; paralegals billed 3912 hours; and law clerks billed 129 hours. The amount charged by the firm for each category of timekeepers was $300 per hour for Elmore, $250 per hour for other partners, $175 per hour for associates, and $125 per hour for paralegals and law clerks.

Harleysville does not generally contest the amount of the costs incurred by Beazer. However, it contends based on the deposition testimony of attorney Brown that a reasonable award

for attorney time would be $500,000. At the rate of $155 per hour (the rate charged by Brown to provide a partial defense of the underlying case), this would amount to 3225 hours that Defendant submits would be reasonable. At the rate of $300 per hour (the rate charged by Elmore and approved by Beazer), this number of hours would equal an award of $967,500, not including costs. However, the billing records as noted above show many more hours of both lawyer and paralegal time than 3225. Clearly, the evidence supports a very substantial attorney's fee and cost award.

The third factor (professional standing of counsel) was also addressed. The Court stated: "Beazer's lead counsel, Mr. Elmore, is an experienced construction law litigator with a reputation as a litigator in South Carolina construction law, and his selection by Beazer to be lead counsel was reasonable." (ECF No. 350, p. 43)

The fourth factor (contingency of compensation) was not applicable because Beazer paid its attorneys by the hour.

With respect to the fifth factor (fee customarily charged in the locality for similar services), the Court appropriately considered testimony that the corporate client, Beazer through both a third party administrator and a claims manager, reviewed, approved, and paid the rates charged by the Elmore Goldsmith firm (ECF No. 350, p. 39); evidence that the Bellamy Firm charged the same rates as the Elmore Goldsmith Firm; and its own knowledge of reasonable fees in the jurisdiction. (ECF No. 350, pp. 17-18.) (Counsel for Harleysville urged during opening statements at trial that it is appropriate for the Court to rely on its own knowledge of appropriate fees.)

The Court has already discussed the beneficial results obtained. (ECF No. 350, p. 43)

In federal court, the amount of an attorney's fee award is ordinarily governed by Local Rule 54.02. Under the "lodestar" formula, the Court multiplies the number of hours reasonably expended

by counsel by a reasonable hourly rate. *Robinson v. Equifax Information Services, LLC*, 560 F.3d 235, 244 (4th Cir. 2009)  In deciding what constitutes a reasonable number of hours and a reasonable rate, the Court's discretion is guided by the twelve factors set forth in *Barber v. Kimbrell's, Inc.*, 577 F.2d 216 (4th Cir. 1978).  Those twelve factors are "(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances;  (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between the attorney and client; and (12) attorneys' fees awards in similar cases."  The most important factor as recognized by the Supreme Court is "the degree of success obtained."  *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983).

Here, the number of hours expended by Elmore's firm was 1875 for Elmore as senior partner, 1138 for other partners, 1785 for associates, 3912 for paralegals, and 129 for law clerks. The amount charged by the firm for each category of timekeepers was ($300 per hour for Elmore, $250 per hour for other partners, $175 per hour for associates, $125 per hour for paralegals and law clerks).  The Court will now discuss the *Barber* factors in order to determine whether the number of hours and the rates were reasonable.

The first factor is the time and labor expended.  This factor is the same as South Carolina factor 2 discussed above.  The second factor is the novelty and difficulty of the questions raised. Elmore testified in his deposition which was introduced into evidence at trial that the underlying

9

True Blue lawsuit was one of the most complex construction defect cases that he has litigated "because of the number of different building types, the number of different contractors who worked on the project, and, more particularly, the way that the Plaintiffs' experts went about their investigation and came up with their repair scope." (Depo., p. 83). The third factor is the skill required to properly perform the legal services rendered. This has been discussed in reference to South Carolina factor 3. The fourth factor is the attorney's opportunity costs in pressing the instant litigation. No evidence was presented concerning other cases that Elmore declined to represent due to the amount of time the True Blue litigation consumed. This factor would not appear to be important to the analysis in this case. The fifth factor, the customary fee for like work, has already been addressed. The sixth factor, the attorney's expectations at the outset of the litigation, would not appear to be relevant because the case was not taken on a contingency basis. The seventh factor, the time limitations imposed by the client or circumstances, would militate in favor of approving the number of hours requested. It is clear that the underlying lawsuit required Elmore's firm to prioritize the case over other matters. The eighth factor, the amount in controversy and the results obtained, was discussed above regarding South Carolina factor 6. The ninth factor, the experience, reputation and ability of the attorney was previously discussed in South Carolina factor 3. The tenth factor, the undesirability of the case within the legal community in which the suit arose, does not apply. There is no indication that this case would have been considered undesirable. The eleventh factor, the nature and length of the professional relationship between the attorney and client, would support a finding that the fees requested were reasonable. This case began in 2009 and ended in 2013. The record also contains evidence that Elmore represented Beazer on several other projects. The twelfth factor, attorneys' fees awards in similar cases, is discussed below.

The Court has already noted in its Findings of Fact and Conclusions of Law that determination of the hourly rate is critical and that "the market rate should be determined by evidence of what attorneys earn from paying clients for similar services in similar circumstances, which of course may include evidence of what the . . . attorney actually charged his client." *Robinson v. Equifax Information Services, LLC*, 560 F.3d 235, 244 (4th Cir. 2009), citing *Plyler v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990). (ECF No. 350, p. 38, note 8) The Court also noted previously that every invoice submitted to Beazer was reviewed both by a third party administrator and Beazer's National Claims Manager before they were approved for payment. The Court also addressed in its Findings of Fact and Conclusions of Law the specific objections by Harleysville to the fees requested, e.g., the length of certain depositions taken by Elmore and the hourly rate charged. The Court made a deduction from the total amount awarded to avoid duplication of effort between Brown and Elmore.

After thoroughly reviewing the evidence presented and applying all of the factors, the Court declines to amend the amount of the attorney's fees and costs awarded. It specifically finds that the hours and rates requested for attorney time are reasonable and necessary and that the costs incurred were also reasonable. The Court notes that substantial attorney's fee awards have been made in other complex civil litigation cases. *See Uhlig, LLC v. Shirley*, 895 F.Supp.2d 707 (D.S.C. 2012)(awarding attorney's fees in the amount of $1,816,494 in employment contract/business tort litigation initiated in 2008 and tried before a jury some three and one-half years later); *Signature Flight Support Corp. v. Landow Avaiation Ltd. P'ship*, No. 1:08cv955 (JCC/TRJ), 2010 WL 3064021, at * 13 (E.D. Va. July 30, 2010)( awarding fees to a prevailing plaintiff in claim for breach of contract and permanent injunction in the amount of $1.3 million; the hourly rates in 2009

11

of two principal attorneys who were located in Northern Virginia were $605 and $290.)

The final argument raised by Harleysville that the Court will address in this order is the argument in Ground Sixteen that this Court failed to properly calculate the amount that Beazer received from other insurers in reimbursement of defense costs. The Court found that an offset against the attorney's fees awarded to Beazer was appropriate for the amount that Beazer had received from other carriers for defense costs and rejected Beazer's argument that these payments constitute collateral sources under South Carolina law. The settlement agreements with the other carriers did not specify the amount that represented defense costs and the amount that represented indemnity and the Court accordingly attempted to do justice. *Welch v. Epstein*, 342 S.C. 279, 536 S.E. 2d 408 (S.C. App. 2000). This Court found that a reasonable method of allocating the defense and indemnity costs was to allocate 43% of the settlements with other carriers to defense costs. (ECF No. 350, Finding of Fact 57, p. 23) This Court disagrees with the argument by Harleysville that the time on risk formula should apply to the question of the proper allocation in these settlements between defense and indemnity costs. *See* this Court's Summary Judgment Order on Fourth Party Claims, ECF No. 249. Therefore, the Court denies the defendant's motion on this ground.

The defendant's Motion for Judgment NOV and for New Trial is DENIED. The motion to amend or make additional findings and to amend judgment is GRANTED IN PART, as to the amount of the time-on-risk indemnity obligation of Defendant Harleysville. Judgment is entered in the amount of $3565, which is Harleysville's time-on-risk indemnity obligation under the Policy.

**AND IT IS SO ORDERED**.

s/ R. Bryan Harwell
R. Bryan Harwell
United States District Judge

Florence, S.C.
January 8, 2014

13